CITIZENS ORGANIZED AGAINST
LONGWALLING, APPELLANT, *v.*
DIVISION OF RECLAMATION,
OHIO DEPARTMENT OF NATURAL
RESOURCES, APPELLEE; SOUTHERN
OHIO COAL COMPANY, INTERVENOR.

(No. 380 — Decided
August 25, 1987.)

*Jonathan Sowash, Anne Manley*
and *Richard Renner,* for appellant.

*Anthony J. Celebrezze, Jr.,* attorney general, and *Bryan F. Zima,* for appellee.

*D. Michael Miller, Alvin J. McKenna, Daniel A. Brown* and *William E. Olson,* for intervenor Southern Ohio Coal Company.

ABELE, J. Appellant Citizens Organized Against Longwalling, a group of landowners affected by intervenor Southern Ohio Coal Company's mining activities, brings this appeal pursuant to R.C. 1513.14 from a November 8, 1985 Ohio Reclamation Board of Review decision which affirmed a June 11, 1984 decision of appellee Chief of the Division of Reclamation, Ohio Department of Natural Resources. The chief's decision approved intervenor's permit application No. 0262 to mine its Meigs Mine No. 2 in Meigs and Vinton Counties, Ohio, using the longwall coal mining method.

The board viewed the land and structures above the permit area in December 1984, and conducted a hearing on December 4 and 5, 1984, Janu-

ary 28, 29, 30, and 31, 1985, and February 1 and 4, 1985. After the parties submitted briefs, the board affirmed the granting of the mining permit. Appellant asserts generally that the permit application fails to include measures required by law to protect the hydrological balance of the region, and asserts specifically that the permit application fails to protect individual water users' rights.

We vacate the board's decision and remand the case to the board for further proceedings consistent with this opinion.

## I. Background

Meigs Mine No. 1, Meigs Mine No. 2, and Raccoon Mine No. 3 comprise the three-mine complex intervenor operates in southeastern Ohio. This appeal involves solely the application intervenor filed for a permit to mine Meigs Mine No. 2 for a period of five years with successive renewals possible pursuant to R.C. 1513.07(A)(4)(a). When extracting Clarion No. 4 coal from the three-mine complex, intervenor will mine beneath sixty thousand to seventy thousand acres of land from now until the year 2022.

Intervenor mines coal at Meigs Mine No. 2 using two underground mining methods known as longwall mining and room and pillar mining. The room and pillar method involves leaving pillars of coal to support the overlying strata after the extraction of coal from between the pillars. The pillars can buckle and collapse at any time in the future, resulting in subsidence of the overlying strata as rock layers fracture and sag into the mine void.

The longwall method involves the use of a specialized machine installed along the face of a large block of coal. Miners create "development entries," or tunnels, to isolate a block of coal five to seven hundred feet wide, five thousand feet long, and five feet high. The isolated block of coal is called a longwall panel.

The longwall mining machine moves along the width of the face of the panel, shearing all the coal from the panel and transferring it onto a conveyor. The longwall method thus involves a very high extraction rate. Hydraulic roof supports hold up the roof of the mine. As the shearer advances, so do the roof supports, allowing the ceiling above the mined-out area to collapse. Subsidence occurs almost immediately as the overburden sags and caves into the void.

The subsidence causes cracks, fractures and fissures to occur throughout the overburden and on the land surface. Roads, buildings and water sources such as wells, ponds and developed springs can suffer damages from the subsidence. In *Keystone Bituminous Coal Assn.* v. *DeBenedictis* (1987), 480 U.S. 470, 474-475, the United States Supreme Court recently noted the sometimes devastating effects of subsidence:

"Coal mine subsidence is the lowering of strata overlying a coal mine, including the land surface, caused by the extraction of underground coal. This lowering of the strata can have devastating effects. It often causes substantial damage to foundations, walls, other structural members, and the integrity of houses and buildings. Subsidence frequently causes sinkholes or troughs in land which make the land difficult or impossible to develop. Its effect on farming has been well documented — many subsided areas cannot be plowed or properly prepared. Subsidence can also cause the loss of groundwater and surface ponds.[2] In short, it presents the type of environmental concern that has been the focus of so much federal,

state, and local regulation in recent decades.[3]" (Footnote 1 omitted.)

In footnotes two and three the court further noted:

" 'Wherever [subsidence effects] extend, damage can occur to buildings, roads, pipelines, cables, streams, water impoundments, wells, and aquifers. Buildings can be cracked or tilted; roads can be lowered or cracked; streams, water impoundments, and aquifers can all be drained into the underground excavations. Oil and gas wells can be severed, causing their contents to migrate into underground mines, into aquifers, and even into residential basements. Sewage lines, gas lines, and water lines can all be severed, as can telephone and electric cables.' Blazey & Strain [Deep Mine Subsidence — State Law and the Federal Response, 1 Eastern Mineral Law Foundation (1980)], § 1.01[2]."

"Indeed, in 1977, Congress passed the Federal Surface Mining Control and Reclamation Act, 91 Stat. 445, 30 U.S.C. § 1201, et seq., which includes regulation of subsidence caused by underground coal mining. See 30 U.S.C. § 1266."

Some experts cite the longwall method's planned, predictable subsidence as an advantage the method holds over the room and pillar method. We note that while the inherent assumption behind the room and pillar method is that the pillars will not collapse and thus the land will not subside and suffer damage, the longwall method anticipates subsidence and resulting damage.

Intervenor began mining Meigs Mine No. 2 in 1972, prior to the enactment of R.C. Chapter 1513 which now governs mining in Ohio. The federal government passed the Surface Mining Control and Reclamation Act, Section 1201 et seq., Title 30, U.S. Code, in 1977, in part to regulate subsidence caused by underground mining. The Act sets minimum standards for mining and provides that the states which promulgate statutes and regulations in keeping with the Act can administer their own mining programs with minimal federal supervision. In August 1982, when the federal Office of Surface Mining Reclamation and Enforcement approved R.C. Chapter 1513 and Ohio Adm. Code 1501:13-1-01 et seq., Ohio obtained the right to administer its own mining program.

From 1977 to 1982, intervenor continued to mine coal at Meigs Mine No. 2 under an interim permit. In October 1982, intervenor applied to the Division of Reclamation for a permit to continue mining Meigs Mine No. 2. Intervenor revised the permit application twice and appellee approved the application and granted Permit D-355 to intervenor on June 11, 1984. The board affirmed on November 8, 1985.

## II. Applicable Law

R.C. 1513.14 governs the scope of our review of the case at bar:

"(A) Any party aggrieved or adversely affected by a decision of the reclamation board of review may appeal to the court of appeals for the county in which the activity addressed by the decision of the board occurred, is occurring, or will occur, which court has exclusive jurisdiction over the appeal.* * *

"* * *

"The court shall affirm the decision of the board unless the court determines that it is arbitrary, capricious, or otherwise inconsistent with law, in which case the court shall vacate the decision and remand to the board for such further proceedings as it may direct."

R.C. 1513.02 charges the Chief of the Division of Reclamation with the following responsibilities:

"(A) The division of reclamation shall administer, enforce, and imple-

ment this chapter. The chief of the division of reclamation shall:

"(1) Adopt, amend, and rescind rules:

"(a) To administer and enforce this chapter;

"(b) To implement the requirements of this chapter for the reclamation of lands affected by coal mining * * *;

"(c) To meet the requirements of the 'Surface Mining Control and Reclamation Act of 1977,' 91 Stat. 445, 30 U.S.C. 1201."

The federal Act sets national environmental performance standards for coal mining. The legislative history of the Act reveals an effort by Congress to integrate reclamation efforts into the coal mining process:

"Because of the evolution of the surface coal mining industry, reclamation and environmental protection actions are often viewed as necessary evils to be tacked on to the end of a process that has been developed for the purpose of producing coal at the least possible cost. Experience with sound reclamation practices, however, indicates that the best approach to mining and reclamation involves the combining of both of these activities in one process. Thus there is ample evidence to reject assertions that 'the reclamation and mining processes cannot be combined.' In fact, the opposite is true.
"* * *

"A basic tenet underlying this legislation is the principle that the environmental protection and reclamation, at a minimum meeting the standards in this act, are a coequal objective with that of producing coal. The continued selection of mining techniques by engineers whose primary objectives are the most efficient removal of the overburden and transport of the coal is not sufficient to be fully responsive to the purposes and intent of the act.

Moreover, if the mine design objectives include the environmental performance standards as elements to be thoroughly integrated in the overall mining process instead of treated as separate rituals to be performed merely because they are required, then it is quite probable that accomplishment of the environmental practices will become cost-effective." 1977 U.S. Code Cong. & Adm. News, 95th Congress, 1st Session, PL 95-87, at 632.

Section 1202, Title 30, U.S. Code reflects the goal of the Act to strike a balance between the nation's need for coal and the nation's need to protect the environment:

"It is the purpose of this Act to —
"* * *

"(f) assure that the coal supply essential to the Nation's energy requirements, and to its economic and social well-being is provided and strike a balance between protection of the environment and agricultural productivity and the Nation's need for coal as an essential source of energy[.]"

III. Appellant's Assignment of Error

"The Reclamation Board of Review wrongfully affirmed the Division of Reclamation's decision granting a coal mining permit which fails to adequately protect landowners' water resources as required by law."

Part A

"A. The permit application's information is unlawfully insufficient to assess or mitigate hydrologic impacts of longwall mining."

In this part, appellant challenges the completeness of the information contained in intervenor's permit application. Appellant contends the information is insufficient to allow an evaluation of mining impacts. Ohio Adm. Code 1501:13-4-13 requires mining permit applications to include information regarding the geological, hydrological, and climatological

characteristics of a proposed mining site. Ohio Adm. Code 1501:13-4-14(D) requires permit applications to detail the proposed implementation of reclamation requirements. Ohio Adm. Code 1501:13-9-04(M) details the monitoring program required for surface and ground water sources in order to reflect any mining-related changes in the quality or quantity of water.

Intervenor appears to have submitted a substantial amount of geological data in Part II of the permit application. Appellant points to one omission of information, required by Ohio Adm. Code 1501:13-4-13(C)(1)(c)(ii), which states an application shall contain the results from boreholes drilled through surface land, and states there should be at least one borehole per one hundred sixty acres. Intervenor submitted the results of eleven of the seventeen required boreholes.

The board found, first, that the record shows the purpose of collecting this data is to determine the acid-forming capabilities of the coal in the event of water discharge from the mine and, second, that Meigs Mine No. 2 was designed to avoid any gravity discharge of water. The board concluded the omission of the borehole data did not flaw the permit application, and noted the chief required intervenor to submit the data late as a condition of the permit approval.

We agree with the board's conclusion. Our reading of the record reveals that as the layer of coal to be mined lies lower than the two main creeks in the area, Raccoon Creek and Leading Creek, the discharge of acid wastes from the mine into the creeks is not anticipated by any of the parties. We find intervenor's application is complete with regard to geological data.

All of the scientists and other experts at the hearing agree that a thorough monitoring program of water sources is necessary to pinpoint and lessen the impacts of mining. Ohio Adm. Code 1501:13-9-04(M) states specific requirements:

"(1) Ground water.
"* * *

"(c) Underground mine operators shall monitor, in a manner approved by the chief, the quality and quantity of ground water in the permit and adjacent areas.

"(i) Monitoring of an area shall begin one year before the area is mined, shall continue during mining, and shall continue for at least one year after the area is mined, unless the chief determines that monitoring for a shorter period will allow accurate assessment of the impacts on the ground water of the area.

"(ii) With the approval of the chief, monitoring of an area to be mined as part of an existing operation within one year after November 23, 1983, may begin less than one year before the area is mined.

"(2) Surface water.
"* * *

"(d) With respect to underground mining operations, the operator shall monitor according to a plan approved by the chief the quality and quantity of any intermittent or perennial streams which flow through or originate on adjacent areas. Monitoring at a minimum shall be done often enough to indicate seasonal variations in water quantity and quality. Monitoring of streams shall be done at points where the streams leave or enter an adjacent area."

According to the Addendum to Part III, item E(5) of the permit application, intervenor proposes the following:

"RECOMMENDED PLAN — Ground Water Monitoring

"For the groundwater monitoring phase of this plan, we propose that quarterly monitoring of *all* surface and

groundwater supplies located above a given longwall mining panel begin one year prior to mining of that panel. When the longwall face is within 500' of a given supply, monitoring frequency will be increased to weekly; when within 100 feet increased to daily. Monitoring will continue on a weekly basis until the longwall face has passed 500 feet beyond the supply; therefore, monitoring will be reduced to a quarterly basis. Stream-monitoring stations will be located before or after a stream crosses a specific panel. It is expected that some of the sources will not be accessible, and permission from landowners may be unattainable in certain cases. We propose to make an honest effort in monitoring *all* developed water sources within 500 feet of a longwall panel." (Emphasis *sic*.)

Appellant does not state exactly in what regard intervenor's monitoring proposals fall short of Ohio law. The record is clear that before 1982, intervenor operated with much less pre-mining data on water sources, which made the evaluation of the extent and nature of mining impacts on water sources extremely difficult. However, it appears intervenor's monitoring proposals as phased in after 1982 comport with Ohio law.

Finally, we note Ohio Adm. Code 1501:13-4-13(G) states an applicant shall submit climatological information if it is required by the chief. The chief did not require such information in the case at bar. We note the board found that the chief receives monthly reports compiled by the Ohio Division of Water which provide this data.

We find no merit to Part A of appellant's assignment of error.

Parts B and F

"B. The permit application's determination of the probable hydrologic impact of longwall mining is unlawfully inadequate."

"F. The Chief of the Division of Reclamation's assessment of the probable cumulative impacts of longwall mining upon hydrology and water availability is unlawfully inadequate."

According to R.C. 1513.07(B)(2)(k), intervenor must submit to the Division of Reclamation a written determination of the probable hydrological consequences of the proposed mining activities. R.C. 1513.02(A)(4) in turn requires the chief of the division to make his own determination of the cumulative probable hydrological consequences of intervenor's proposed mining activities. The parties refer to the chief's determination as a "CHIA," an acronym for "cumulative hydrological impact assessment."

The American Electric Power Company engaged the firm of Burgess and Niple, Limited, in June 1983, to help intervenor prepare a written hydrological determination to submit to the chief. The firm studied intervenor's past and future mine sites and issued a report which states on page three:

"The probable future effects on the hydrologic balance due to longwall mining should be minimal based on the geology and hydrology of the area and the observed effects over the last 5 years."

The Ohio Department of Natural Resources commissioned a report by Ground Water Associates, Inc. ("GWA"), in order to aid the preparation of the chief's CHIA. GWA initiated a detailed mapping program in June 1983, to locate and map all existing water sources in relation to each longwall panel. In its October 1983 report entitled "Effects of Land Subsidence on the Hydrological Balance in the Vicinity of the Meigs No. 2 Mine, Meigs and Vinton Counties, Ohio," GWA wrote:

"Changes in the hydrological balance related to subsidence effects over

Meigs No. 2 Mine have been subtle and complex. To date, 29 water supplies have been monitored over the mined areas. Of these, seven (24 percent) have been affected by mining activities, while at least seventeen (59 percent) have apparently shown no effect. In five supplies (17 percent) there may have been possible impacts, but the data is insufficient to determine if they have been mine related."

Intervenor's two-page hydrologic determination states that intervenor does not expect any "permanent adverse or significant impact" on the hydrological regime from the proposed mining. Intervenor further states that using the historical impact percentages derived from the GWA report, it estimates the mining will impact less than twelve of the sixty-four inventoried primary water sources at Meigs Mine No. 2.

The chief studied the GWA report and other current literature in preparing his twelve-page CHIA. The CHIA cites the percentage of impacted water sources observed to date as discovered:

"While there is a possibility of some localized dewatering of small streams and farm ponds, this is not a regionally significant impact. Dewatered impoundments are considered repairable. In cases where streams are dewatered, monitoring will show whether the impact to the watershed is significant."

The chief qualified his CHIA as follows:

"After approximately a decade of mining, there have been no known long-term or regional adverse hydrologic impacts that have resulted from these three mines. This should be qualified by adding that specific studies prior to mining were not done and that the mining method with the greatest potential for adverse hydrologic impacts, the longwall, has only

been used in the area for the past four (4) years at the #1 mine, and for the past six (6) years at the #2 mine.

"* * *

"The three statements of probable hydrologic consequences supplied by the applicant may be overly optimistic. The statement that no permanent adverse or significant impacts will occur due to the operations is based on a generalized description of the typical hydrologic cycle of precipitation, runoff and infiltration, evapotranspiration.

"* * *

"There is, however, a lack of definitive research in this area that would allow one to conclusively interpret data that has or could be obtained. Where these adverse effects will occur is largely a matter of speculation."

Appellant successfully impeached the GWA report during the hearing before the board, casting doubt upon the percentages of past impact, and upon the use of the GWA report figures as a base for either the intervenor's hydrological determination or the chief's CHIA. During appellant's rebuttal case, Samuel Stowe, a consulting hydrogeologist and principal author of the GWA report, testified he did not design the report to serve as a base for future projections of impact.

After careful questioning by appellant, Stowe revealed that the impact percentage figures will change drastically if several variables change. For example, GWA and intervenor frequently list water sources as "not impacted" if there is insufficient premining data to make a determination. Also, GWA did not differentiate between those water sources undermined by the room and pillar method and those undermined by the longwall method. Stowe agreed this made the "no impact" percentage look artificially optimistic. The "no impact" percent-

age might also be artificially high due to the report's inclusion of water sources which were not directly above a longwall panel, but hundreds of feet away.

We agree with appellant that intervenor's hydrological determination and the chief's CHIA appear too general, unsubstantiated, and optimistic. However, we also agree with appellee's argument that it is impossible for either intervenor or the chief to predict the future effects of mining with absolute certainty. Even more importantly, we note that while the board considered the GWA report flawed, the board held that other information existed to support the conclusions of intervenor's hydrological determination and the chief's CHIA, and rendered the determination and the CHIA adequate.

We believe the board's decision is neither inconsistent with the law nor arbitrary or capricious with respect to the matters raised in Parts B and F of appellant's assignment of error. Accordingly, we find no merit to Parts B and F of appellant's assignment of error.

Parts C and D

"C. The permit application unlawfully fails to demonstrate that longwall mining has been planned and will be conducted to minimize disturbances to the hydrologic balance."

"D. The permit application unlawfully fails to provide a detailed description of measures to be taken to assure the protection of the rights of present water users from the destruction caused by longwall mining."

Appellant contends intervenor has not planned and designed the mining operation with a view towards preventing or minimizing subsidence damage to water sources, as required by R.C. 1513.07(E), Ohio Adm. Code 1501:13-9-04 and Ohio Adm. Code 1501:13-4-14(E)(1)(b). Intervenor argues the statutory framework does not require it to take any measures other than monitoring and replacing water sources.

Appellee and intervenor further argue that their choice of the longwall method is in itself an effort to comply with the law; they point out that the law favors longwall mining over strip mining, and that the longwall method's controlled, predictable and immediate subsidence makes it possible for a still-existing company to make reparations.

While appellant terms this argument "nonsensical doubletalk," the argument does make clear the curious contradiction inherent in the longwall method. The method causes more damage than the room and pillar method causes, but because damage from longwall mining is immediate and monitored, it is more easily repaired than damage which might result from room and pillar mining.

Appellant introduced testimony regarding certain longwall mining procedures which protect the hydrologic balance such as leaving certain sections of coal unmined, mining continuously rather than breaking for weekends, and widening the longwall panels. The board found that many of these and other operational methods — most from a book by an expert named Dr. Syd S. Peng — are intended to reduce the effects of subsidence on discrete surface structures, as opposed to an entire hydrologic regime.

We note Ohio Adm. Code 1501:13-4-14(K)(2) authorized the chief to require a subsidence control plan detailing the choice of mining method and the layout of the underground workings if certain enumerated structures are involved or if the chief determines material damage could occur to the land. In the case at bar, the chief did not make such a determination. Thus, we conclude that the statutory framework does not preclude intervenor's

program of longwall mining, monitoring and replacement as a viable design to minimize hydrologic disturbance. Accordingly, we find the board's decision is neither inconsistent with law, nor arbitrary or capricious with respect to the matters raised in Parts C and D of appellant's assignment of error.

We find no merit to Parts C and D of appellant's assignment of error.

Part E

"The permit application's water replacement plan for water resources damaged by longwall mining is unlawfully inadequate."

R.C. 1513.162(A) requires coal mining operations to replace water supplies which are contaminated, diminished, or interrupted by coal mining:

"The operator of a coal mining operation shall replace the water supply of an owner of interest in real property who obtains all or part of his supply of water for domestic, agricultural, industrial, or other legitimate use from an underground or surface source where the supply has been affected by contamination, diminution, or interruption proximately resulting from the coal mining operation and shall reimburse the owner for the reasonable cost of obtaining a water supply from the time of the contamination, diminution, or interruption by the operation until the water supply is replaced."

Ohio Adm. Code 1501:13-9-04(O) repeats the statute. Ohio Adm. Code 1501:13-4-14(E) requires coal mining permit applications to include a reclamation plan for the protection of the hydrologic balance. The plan must describe measures to be taken to protect the quality of water systems within the proposed mining area, the rights of present users of water in the area, and the quality of the water in the area:

"(E) Reclamation plan: protection of hydrologic balance.

"(1) Each plan shall describe the measures to be taken during and after the proposed underground mining operations in accordance with rule 1501:13-9-04 of the Administrative Code to ensure the protection of:

"(a) The quality of surface- and ground-water systems within the proposed permit area and adjacent areas from the adverse effects of the proposed underground mining operations;

"(b) The rights of present users of surface and ground waters within the permit area and adjacent areas;

"(c) The quality of surface and ground water within the proposed permit area and adjacent areas from adverse effects of the proposed underground mining operations, *or to provide alternative sources of water in accordance with paragraph (F) of rule 1501:13-4-13 and paragraph (O) of rule 1501:13-9-04 of the Administrative Code, where the protection of quantity and quality cannot be ensured[.]*" (Emphasis added.)

The coal mining applicant may, rather than protecting the quantity of the water, provide alternative sources of water pursuant to Ohio Adm. Code 1501:13-9-04(O), mentioned *supra;* and 1501:13-4-13(F), which requires coal mining permit applications to contain a description of alternative sources of water that the operator could develop to replace existing water sources, if the existing sources might suffer contamination, diminution, or interruption:

"(F) Alternative water supply information. The application shall identify the extent to which the proposed underground mining operations, including subsidence impacts, may proximately result in contamination, diminution, or interruption of an underground or surface source of water for domestic, agricultural, industrial, or other legitimate use. If contamination, diminution, or interruption may result,

then the description shall identify the alternative sources of water supply that could be developed to replace the existing sources."

Intervenor recognized that appellant's water sources might suffer contamination, diminution, or interruption. Accordingly, intervenor included a water replacement plan in its permit application. The plan provides in full:

## "ADDENDUM TO PART 2, ITEM F (1), (2)

## "SOUTHERN OHIO COAL COMPANY — MEIGS MINE NO. 2 ALTERNATIVE WATER SUPPLY INFORMATION

"Based on the information presented with Part 2, Items B, C, D, and E of this application, it is felt that, in general, the proposed mining operations will not result in the contamination, significant diminution, or interruption of underground or surface sources of water supplies. The impermeable nature of the majority of the bedrock units in this area prevents the downward movement of groundwater, and therefore, the availability is very limited. There are no formations considered as aquifers and the only groundwater developed is from minor water producing zones.

"The information obtained from the water supply inventory indicates that a significant number of residences rely on the public rural water system as their source and obviously no impact from the mining is expected for these users. Because seeps supplying dug wells and springs are part of a relatively shallow flow system, the mining should have very little or no effect. Surface cracking directly over panel areas as a result of subsidence is generally of a very shallow nature and any interruption to surface or groundwater flow should be limited to a short distance or depth. If contamination,

significant diminution, or interruption of an underground or surface source of water supply occurs, an attempt would be made to determine if it is related to the activities of the mining operation. The alternative water supply contingency plan established by Southern Ohio Coal Company will be implemented if the problem is related to the activities of the mining operation. In general, the plan will provide for a temporary water supply while a permanent alternative water supply is sought or remedial measures are taken to correct the affected supply. Due to variations in these situations it will be necessary to seek the alternative source on a case-by-case basis. The selection of an alternative water supply will be based on negotiations between the affected individual and the coal company. One consideration in the negotiations will be the potential for the development of an on-site source such as a spring, dug well, pond, or drilled well to supply the needed water. This potential would depend on the specific site conditions and would be handled on an individual basis. In cases where an on-site source does not appear feasible, the use of a public supply such as the Leading Creek rural water supply system will be considered."

Robert Rothwell, Deputy Chief of the Division of Reclamation, testified regarding the importance appellee and intervenor place upon piped water as a satisfactory replacement for contaminated, diminished, or interrupted water supplies:

"Q. Actually, viewing it, there would be no regional impact even if all of the local water was taken provided there was a source, an alternate source?

"A. Well, I think because of the fact that there was an alternate source would tend to indicate that you did not have a regional impact because there

was still water available within the region to supply those people with.

"Q. So your idea of hydrologic balance then includes not only ground water, surface water, but it includes piped water?

"A. Piped water certainly has to come from somewhere.

"Q. The answer to my question is yes?

"A. Oh, yes.

"* * *

"Q. Who pays for or provides for additional cost of the city water if the existing water supplies, natural water supplies are lost?

"A. I don't know.

"Q. Let's go to page 11 in your assessment, and I think that we have already talked about some of this where you say in, for example, the fourth sentence down, 'While there is a possibility of some localized dewatering of small streams and farm ponds, this is not a regionally significant impact.'

"A. Yes.

"Q. And the reason you say that is because not enough localized impacts have occurred?

"A. Right.

"Q. And you don't know exactly at what point enough of them occurs that it becomes a regional impact?

"A. Right.

"Q. But the way you view it, the company could virtually dewater the entire area, and as long as they provided some * * * reparation, there would be no violation?

"A. If they could replace the water supply, then obviously, they haven't dewatered the area.

"Q. Do you know whether or not any of these things have actually been repaired by the company to date?

"A. Yes.

"Q. Some of them have?

"A. Yes.

"Q. And the ones that have not

are technically, under definition, in violation now?

"A. Some have been repaired. Others have been replaced. Some have come back on their own volition because of the cracks closing up, whatever.

"Q. When did they become a violation? You guys could wait for two years for it to come back on its own before you decide it is a violation?

"A. That is right."

Intervenor's resort to piped water as a replacement water source prompted appellant's president, Mary Lou Mullins, to testify:

"* * * [W]e don't consider a Leading Creek water tap, piped water, an alternative to our springs and wells. Hydrological balance, I don't believe, is in a pipe."

Ohio Adm. Code 1501:13-4-14(E) requires the water replacement plan to protect the hydrologic balance. Ohio Adm. Code 1501:13-1-02(FF) and (GG) define "hydrologic balance" and "hydrologic regime" as follows:

"(FF) 'Hydrologic balance' means the relationship between the quality and quantity of inflow to, outflow from, and storage in a hydrologic unit such as a drainage basin, aquifer, soil zone, lake, or reservoir. It encompasses the quantity and quality relationships between precipitation, runoff, evaporation, and the change in ground and surface water storage.

"(GG) 'Hydrologic regime' means the entire state of water movement in a given area. It is a function of the climate, and includes the phenomena by which water first occurs as atmospheric water vapor, passes into a liquid or solid form and falls as precipitation, moves then along or into the ground surface, and returns to the atmosphere as vapor by means of evaporation and transpiration."

We agree with appellant that, given the complexity inherent in a

hydrologic regime, piped water will not ordinarily restore a disturbed hydrologic balance. Piped water involves a tremendous and continuous human intervention into an otherwise natural hydrologic regime. More importantly, from appellant's point of view, piped water involves a monthly water bill which intervenor apparently expects the landowners to pay.

In order for piped water to be a true "replacement water source," we believe the coal mining operator would have to pay the bill. We note R.C. 1513.162(A) contemplates a cost-free water supply replacement for the landowner:

"(A) The operator of a coal mining operation shall replace the water supply of an owner of interest in real property who obtains all or part of his supply of water for domestic, agricultural, industrial, or other legitimate use from an underground or surface source where the supply has been affected by contamination, diminution, or interruption proximately resulting from the coal mining operation and *shall reimburse the owner for the reasonable cost of obtaining a water supply from the time of the contamination, diminution, or interruption by the operation until the water supply is replaced.*" (Emphasis added.)

We find intervenor's water replacement plan lacking in another very important respect. The federal government passed the 1977 Surface Mining and Reclamation Act in an effort to make environmental protection and reclamation a coequal objective with that of producing coal, rather than a mere afterthought. See 1977 U.S. Code Cong. & Adm. News, 95th Congress, 1st Session, PL 95-87, 632. Intervenor's water replacement plan fails to state in advance what measures intervenor will take to replace damaged water supplies. The plan merely states intervenor will "negotiate" with the landowners.

A third major problem with intervenor's water replacement plan involves the negotiation provisions. The provisions, while optimistic, are dangerously vague, and leave intervenor too much leeway to implement water replacement plans in the same fashion as intervenor implemented such plans prior to the enactment of R.C. 1513.162.

The record is replete with past instances in which intervenor displayed bad faith when responding to landowners' claims concerning damaged water supplies. Notable among claimants are the members of the Lavern and Mary Jordan family and Mark Spezza. Mary Jordan testified that after her family's water supplies — a developed spring with an eighteen-thousand gallon reservoir and a pond — were dewatered in September 1980, after longwall mining, the family hauled its own water for nearly two and one-half years. She apparently received little initial response from her complaints to intervenor. Appellee's deputy chief, Robert Rothwell, testified:

"Well, we are not really sure with the Lavern Jordan situation because we didn't have the pre-mining data on that well necessary to really pinpoint what the impacts were."

Intervenor's senior construction engineer, David Vanzant Wright, commented:

"Q. So your testimony was that there was no alternate water supply provided to the Jordans until you negotiated settlement with them?

"A. That is right.

"Q. Well, if they didn't have to give up anything, why didn't you just extend the water service to them as soon as their water supplies were affected?

"A. Like I say, we never saw it [any change]."

Soon after a November 1982 Columbus Dispatch newspaper article publicized the Jordans' plight, intervenor installed piped water for the Jordans. Intervenor, however, never replaced the Jordans' pond as promised.

Appellant's exhibits submitted below include photographs of the Spezza property. The photographs depict a collapsed cistern inside his barn, and the condition of his farm pond before and after longwalling. The pond failed to hold water after the mining, and was nearly empty when photographed in October 1983. We note appellant, Spezza, and others currently have a lawsuit pending in federal court concerning longwall mining beneath their properties. *Citizens Organized Against Longwalling* v. *Watt*, S.D. Ohio, E.D. No. C-2-83-1452.

A fourth problem with intervenor's water replacement plan also involves the negotiation provisions. The right to a water source is a crucial right for rural landowners. The record reveals intervenor frequently asks landowners to execute a waiver as part of the negotiations. We question whether all landowners will have or should have access to legal counsel in order to negotiate on an equal footing with intervenor. Meigs and Vinton County residents are among the poorest in Ohio. Figures from the latest United States census reveal only three counties of Ohio's eighty-eight counties have a median family income lower than that of Meigs and Vinton Counties.

We find several additional problems with intervenor's water replacement plan. How quickly will intervenor provide landowners with temporary water supplies? We question exactly what attempt intervenor will make to determine whether longwall mining has caused damage to a particular water source. If causation is difficult to determine, is intervenor free to disclaim liability? We believe the burden to prove causation should fall on the mining operator. The mining operator without doubt stands in a much better position than the landowner to prove or disprove causation.

In summary, we find the board's decision regarding intervenor's water replacement plan to be inconsistent with law. We find merit to Part E of appellant's assignment of error.

Part G

"The Chief of the Division of Reclamation failed to fulfill his duties as required by Ohio's coal mining laws and regulations in reviewing the permit application."

To the extent consistent with our discussion of Part E, we find merit to Part G. To the extent consistent with our discussion of the other parts, we find no merit to Part G.

For the reasons stated in our discussion of Part E, we sustain appellant's assignment of error. Pursuant to R.C. 1513.14, we vacate the decision of the Ohio Reclamation Board of Review and remand this case to the board. We direct the board to require intervenor to draft a new water replacement plan consistent with this opinion and consistent with law.

IV. Limitations of this Action

We feel compelled to comment on the limitations of our opinion in this action. Appellant's assignment of error contends the coal mining permit issued to intervenor "fails to adequately protect landowners' water resources as required by law." It appears clear that even in a most optimistic view, intervenor expects that subsidence damage from longwall mining pursuant to the permit will dewater some wells, empty some ponds and change some intermittent stream flow patterns.

The protection of water resources actually involves two questions: first,

whether the coal mining operator has complied with the requirements of R.C. Chapter 1513 and related regulations, and second, whether the deeds which severed the mineral estates from the surface estates give the coal mining operator the right to affect the landowners' water resources.

Unfortunately, R.C. Chapter 1513 limits our opinion in this appeal to the first question. R.C. 1513.07(E)(2)(e)(iii) clearly provides: "This chapter does not authorize the chief to adjudicate property rights disputes." R.C. 1513.162(B) similarly, and emphatically, provides:

"This chapter does not affect in any way the right of any person to enforce or protect, under any applicable, law, his interest in water resources affected by a coal mining operation." See, also, R.C. 1513.15(I).

Just as the chief may not review property right disputes, the board may not review such disputes. R.C. 1513.13(B) limits the board to one of three choices: affirm, modify, or vacate and remand the chief's decision. We note R.C. 1513.05 provides the board is constituted of citizens appointed by the Governor with the advice and consent of the Senate. Only one of the seven members of the board need be an attorney. The board hardly has the legal expertise necessary to resolve complicated property disputes.

R.C. 1513.14 limits us to either affirming, or vacating and remanding, the decision of the board. We can do nothing else. Neither the chief, the board, nor we may review property disputes within the context of an R.C. Chapter 1513 action.

We take judicial notice of the fact that at least four of the landowners in appellant's group have raised the property dispute issue in a declaratory judgment lawsuit filed on August 1, 1986, in the Vinton County Court of Common Pleas. The landowners ques-

tion intervenor's right to longwall mine below their property. They note the deeds severing their surface and mineral estates date in the 1950s, long before the longwall method was in the contemplation of the parties to the severance deeds. In *Skivolocki* v. *East Ohio Gas Co.* (1974), 38 Ohio St. 2d 244, 67 O.O. 2d 321, 313 N.E. 2d 374, the court held that severance deeds executed before the time modern strip-mining techniques became widely employed do not convey to the mineral estate the right to strip-mine using the modern techniques.

The landowners also note Ohio law provides surface owners retain the right of subjacent support unless such right is expressly granted to the mineral owner. As recently as 1975, the Ohio Supreme Court reaffirmed the principle that "the owner of the land has the right to subjacent support, and any conveyance or waiver of this right must clearly appear in the instrument conveying the estate." *Quarto Mining Co.* v. *Litman* (1975), 42 Ohio St. 2d 73, 83-84, 71 O.O. 2d 58, 63-64, 326 N.E. 2d 676, 684. See, also, *Ohio Collieries Co.* v. *Cocke* (1923), 107 Ohio St. 238, 140 N.E. 356.

In the Vinton County actions landowners allege intervenor has intentionally and negligently pursued approval of permits to mine coal by the longwall method on the landowners' land without being in compliance with state and federal laws and regulations. Curiously, intervenor answered the complaint in part by stating the landowners' claims "are barred by the doctrine of estoppel because such claims have been or could have been raised and litigated in other forums by the landowners' representative, Citizens Organized Against Longwalling," and "are barred by the doctrine of res judicata because such claims have been or could have been litigated by [Citizens Organized Against Longwall-

ing] in legal actions which have been filed in other forums," and "[p]laintiffs have failed to exhaust the administrative remedies available to them regarding their claims concerning [intervenor's] mining activities," and most curiously, "[t]he mining and removal of coal from beneath the properties * * * is or will be done pursuant to a license for such mining and removal as well as for any consequent effects of such activities * * *."

Intervenor appears to contend that a permit obtained pursuant to R.C. Chapter 1513 ends any property dispute regarding the relative rights of the surface estate and mineral estate owners and, further, such a permit immunizes intervenor from lawsuits regarding damages resulting from the mining.

We emphatically note that the permit obtained by intervenor in the case at bar does not resolve property disputes between the parties and does not immunize intervenor from liability for damages caused by mining pursuant to the permit. We specifically hold that our opinion regarding the mining permit in the case at bar is subject to the resolution of property disputes which have been raised, or might be raised, in other forums.

*Order vacated*
*and cause remanded.*

GREY, P.J., and STEPHENSON, J., concur.

GREY, J. concurring. I concur in the judgment and opinion but feel required to concur separately because I believe the Reclamation Board of Review misapprehends the extent of its duty to review permit applications under R.C. 1513.13 and 1513.162.

Longwall mining is, as is demonstrated in the record, an efficient and obviously more economical way to mine coal. As noted in the brief of the intervenor, Southern Ohio Coal Company, and *amicus curiae* brief of Local 1886, there are substantial economic benefits to our society from the longwall mining process. There is in the record a clear demonstration that in some respects longwall mining is beneficial because of the predictability and immediacy of subsidence (Finding of Fact No. 26). The predictability and immediacy are considered beneficial because they occur at a time when the mine operator is available to repair any damage that might be done. But such a benefit is available, however, only if the board of review sees to it that the persons affected are predictably and immediately compensated.

As noted in the intervenor's and *amicus'* briefs, there is an enormous investment in this coal seam. In a like manner, however, there is proportionately a substantial investment by the surface owners in the properties that they hold. The economics in this case are relatively simple. Longwall mining, which is more efficient and more economical, causes some damage because of the subsidence. The cost of this damage does not go away. It must be borne by someone. The landowner whose water supply is dewatered should not be forced to bear the entire economic cost of the effects of longwall mining. Since society as a whole and the permit holder in particular benefit from the granting of the permit, the costs of dewatering equitably, and legally under R.C. 1513.162, ought to be borne by the permit holder. The expense necessary to replace the loss of surface water supplies to any homeowner is just another cost of doing the longwall mining. This expense will increase the cost of coal, and ultimately the cost of electricity, but it is only reasonable that it be paid by electricity users in proportional shares rather than by affected landowners in disproportionate shares.

The board of review found that the

overall effect of granting this longwall mining permit would be minimal. I believe the record amply justifies the board's conclusion. However, one might as easily say that when a foul ball is tapped into the stands at a baseball game, the effect of the ball on the crowd is minimal. To the individual fan who catches a hard fast one in the face, the effect is not minimal, but is, as appellant notes, devastating. The board of review, in my opinion, while fully justified in concluding that the overall effects of the permit on the population in general would be minimal, has failed to adequately provide for the individual who is singly and devastatedly affected. The water replacement plan simply does not provide any sort of reasonable protection or remedy for a person whose water supply has been affected by the longwall mining operation. Finding of Fact No. 50 provides as follows:

"David Wright is responsible for the administrative [sic] of Southern Ohio Coal's Alternative Water Replacement Plan. (Wright, Tr. 944.) This plan is part of the permit application. (Permit App., Addendum to Part 2, Item F(1), (2).) The plan provides that, if contamination, significant diminution, or interruption of an underground or surface source of water supply occurs as a result of mining activities, Southern Ohio Coal Company will:

"a.   provide temporary water supply while a permanent alternative is sought or remedial measures are taken to correct the affected supply,

"b.   seek an alternative source an [sic] a case-by-case basis, based upon negotiation as to the type of supplies to be installed, and

"c.   give first consideration to the development of an on-site source, such as a spring, well or pond."

This plan really provides no protection or enforceable rights for the affected landowner, nor does it impose any duty on the permit holder with any degree of specificity. The duties imposed on the permit holder where there has been a disruption of the water supply is particularly defective because it has no framework by which an affected landowner can establish and enforce his right to an adequate water supply. A right without a remedy is useless. The plan simply talks about "negotiations," and "case by case analysis." The board clearly failed to establish a reasonable plan for guaranteeing surface owners an enforceable right to a continuous and regular source of water. Negotiation is hardly a remedy at all. Indeed a siege is nothing more than negotiation for the surrender of the city, while its inhabitants' water supply dwindles.

It seems clear from the record based on all the exhibits and testimony that not many people will be affected by a loss of water supply. Some of the losses will be self-healing, and some of the disruptions will be only temporary, and only a few will be adversely affected. However, those few individuals will be severely affected. One asks, hypothetically, how long can a homeowner go without a glass of water or a clean shirt or shower? It is an abuse of discretion for the board not to require that those few have a timely, definite, specific and enforceable remedy to compel the permit holder to resupply them with an adequate water supply. The board, for example, speaks of "reasonable time," yet reasonable time is left undefined. Is forty-eight hours a reasonable time? To a family without water anything longer might seem unreasonable.

It is in this area where I believe the board has abused its discretion and has failed to apply the relevant statutes. In order for a permit to be granted, the operator must replace a water supply and reimburse the owner. Since the board found that this will in fact happen to a few people, the board must

order very specifically and very definitely procedures to be followed when this happens. Again we wish to emphasize that we recognize this will cost money. But since the board's very own findings indicate that this will only happen in a few isolated cases, requiring the permit holder to act immediately will not be burdensome because of the few cases in which it will happen. This is the kind of balancing of interests that the board is required to do. R.C. 1513.13.

On remand, the board of review should, I believe, limit its reconsideration of the permit application solely to this issue: the adoption of a water replacement plan which has immediate, definite, and enforceable rights for those persons who are adversely affected. The decision of the board of review is amply supported by the record in all the other matters. I would add one final note regarding the final comment of the majority opinion. Our decision in this case is limited solely to the question of the Reclamation Board of Review's decision to affirm the approval of Permit No. 0262 for Meigs Mine No. 2. We have not, as the majority notes, considered or decided any issue regarding property rights, tort claims, or the right of subjacent support. Not having decided any of these issues, I believe our opinion should not comment on them at all.

Thus I concur in the majority opinion sustaining Assignment of Error Part E and remanding the case to the Reclamation Board of Review for further proceedings on that issue.