CASTLE VALLEY SPECIAL SERVICE DISTRICT, North Emery Water Users Association, and Huntington–Cleveland Irrigation Company, Petitioners,

v.

UTAH BOARD OF OIL, GAS and MINING, Respondent.

C.W. Mining Co. dba Co–Op Mining Company, Intervenor.

No. 950487.

Supreme Court of Utah.

Dec. 31, 1996.

Rehearing Denied May 19, 1997.

James L. Warlaumont, Jeffrey W. Appel, Benjamin T. Wilson, Salt Lake City, for Castle Valley.

J. Craig Smith, David B. Hartvigsen, Salt Lake City, for North Emery and Huntington–Cleveland.

Jan Graham, Atty. Gen., Thomas A. Mitchell, Patrick J. O'Hara, Asst. Attys. Gen., Salt Lake City, for Board of Oil, Gas & Mining.

F. Mark Hansen, Carl E. Kingston, Salt Lake City, for Co–Op Mining.

STEWART, Associate Chief Justice:

Petitioners Castle Valley Special Service District, North Emery Water Users Association, and Huntington–Cleveland Irrigation Company (collectively, Water Users) seek review of an order of the Utah Board of Oil, Gas and Mining (Board) denying Water Users' petition to amend a previous order and its accompanying findings of fact and conclusions of law. The Board entered the first order following a hearing in which Water Users sought reversal of the grant of a revision of intervenor Co–Op Mining Company's (Co–Op) coal mining permit by the Division of Oil, Gas and Mining (Division). Water Users object to (1) certain findings of fact and conclusions of law made by the Board in support of its order affirming the permit revision grant, and (2) the Board's refusal to order Co–Op to identify and provide water resources to ameliorate alleged past and future harm to Water Users' springs caused by Co–Op's mining.

The events leading to our review of Water Users' petition began when Co–Op applied to the Division for a significant revision of its underground coal mining permit. Under this permit, Co–Op was mining a layer or seam of coal known as the Blind Canyon seam that is located in Emery County.

The requested revision would permit Co–Op to mine another layer of coal, the Tank seam, located within the existing permit area about two hundred feet above the Blind Canyon seam. The validity of the existing permit was not at issue in the hearings held on the revision request. A renewal application for that permit was later submitted to the Division in separate proceedings. Water Users have expressed concern that some of the Board's findings and conclusions would collaterally estop them in the permit renewal hearing, and this appears to be the primary motivation for contesting those findings and conclusions. However, whether the challenged findings would collaterally estop Water Users on any issues in the permit revision proceeding can be decided only in the proceeding in which the issue is raised. We therefore do not address that issue here.

## I

Water Users include a special service district, a nonprofit water users association, and a mutual irrigation company, and they provide water for culinary and irrigation purposes in northern Emery County. The bulk of this water comes from two springs, Birch Spring and Big Bear Spring, which are located near Co–Op's mine but just outside the permit area. Water Users opposed the Tank seam revision, claiming that Co–Op's mining has reduced the quantity and quality of water from these springs. The Division approved the revision. Water Users appealed to the Board, arguing that the revision application was defective in failing to recognize and address ongoing harm to the springs from Blind Canyon mining and that the extension of mining operations into the Tank seam would continue and increase that harm. Water Users asked the Board to deny the permit revision or, alternatively, to condition the revision on the requirements (1) that Co–Op "provide, at no expense, replacement water to [Water Users] to mitigate the adverse impacts of its mining activity" on the springs and (2) that Co–Op "implement adequate

procedures to protect these water sources from contamination." Co–Op denied that its mining activities had affected the springs.

The Board's order affirmed the Division's approval of the permit revision and declined to impose the additional conditions. In the accompanying findings of fact and conclusions of law, the Board stated that the Blind Canyon seam was hydrologically separate from the springs and that Co–Op's prior mining operations had not affected the springs. Water Users petitioned the Board to strike these findings and conclusions and to require Co–Op to identify replacement water sources.[1] The Board declined to do so. We granted Water Users' petition for review.

## II

We turn first to the replacement water issue: whether the Board erred in refusing to order, under 30 U.S.C.A. § 1309a (West Supp.1996), Co–Op to either (1) identify or (2) actually provide water resources to replace spring water that had been or might be diverted or contaminated as a result of Co–Op's mining. The regulation of surface and underground coal mining is governed generally by the federal Surface Mining Control and Reclamation Act (Surface Mining Act or Act), Pub.L. No. 95–87, 91 Stat. 445 (1977) (codified as amended at 30 U.S.C. §§ 1201–1328). The Surface Mining Act establishes procedures for the issuance of mining permits and detailed standards for the conduct of mining operations, including standards designed to limit the impact of mining on water resources. However, the Act permits a state to undertake primary responsibility for regulating mining, subject to oversight by the federal Office of Surface Mining, by enacting a state regulatory program at least as stringent as the requirements set forth in the Act. 30 U.S.C. § 1253 (1988). State statutes and regulations thus become the direct authority for regulating coal mining. Utah has qualified for primary enforcement authority. *See*

---

1. Water Users' petition for modification described the issue presented to the Board at the hearing as whether to direct water replacement remedies (identification or provision of replacement sources) for impacts which might result

from Tank seam operations. In their original petition to the Board, Water Users asserted that they needed these remedies in part because of harm from existing operations.

30 C.F.R. § 944.10 (1996) (approving Utah's coal mining program effective January 1981).

Water Users asked the Board to order replacement water on the authority of 30 U.S.C.A. § 1309a(a)(2), a relatively recent addition to the Surface Mining Act.[2] In relevant part, section 1309a(a) provides:

§ 1309a. Subsidence

(a) Requirements

Underground coal mining operations conducted after October 24, 1992, shall comply with each of the following requirements:

. . . .

(2) Promptly replace any drinking, domestic, or residential water supply from a well or spring in existence prior to the application for a surface coal mining and reclamation permit, which has been affected by contamination, diminution, or interruption resulting from underground coal mining operations.

Nothing in this section shall be construed to prohibit or interrupt underground coal mining operations.

30 U.S.C.A. § 1309a (West Supp.1996). Following enactment of 30 U.S.C.A. § 1309a, the Utah Legislature adopted a provision closely tracking the language of another portion of 30 U.S.C.A. 1309a, but it did not include a provision corresponding to subsection (a)(2). *Compare* 30 U.S.C.A. § 1309a(a)(1) *with* Utah Code Ann. § 40–10–18(4) (Supp.1996). Despite this difference, the Office of Surface Mining approved section 40–10–18(4) as an amendment to Utah's coal mining program. 30 C.F.R. § 944.15(ff)(1996) (approval effective July 1995). Water Users' argument that they are entitled to replacement water therefore rests on 30 U.S.C.A. § 1309a rather than on Utah law.

■ The Board rejected Water Users' request for identification and/or provision of replacement water. The Board ruled that section 1309a was inapplicable to Water Users because they had failed to prove that

their springs had been affected by Co–Op's mining. We review this question of statutory construction for correctness. *Bennion v. Graham Resources, Inc.*, 849 P.2d 569, 570 (Utah 1993). The Board also "question[ed] whether" it had jurisdiction to enforce the federal statute in any event. Because we conclude that section 1309a did not apply, we need not address the question of the Board's authority to enforce it. *See Williams v. Public Serv. Comm'n,* 754 P.2d 41, 50 n. 9 (Utah 1988) (court may ignore jurisdictional issue and reach the merits if the result is the same as a finding of no jurisdiction).

In applying section 1309a, the Board was faced with two questions: (1) whether the section authorizes the Board to require water resource identification as a preventive measure before any water supplies have been adversely affected and (2) whether Co–Op's existing mining operations have harmed the springs so that post-damage water replacement is required under the section.

■ As to the first issue, the plain language of section 1309a(a)(2) clearly supports the Board's conclusion that this portion of the statute does not authorize water resource identification as a preventive measure. That provision deals only with water replacement, not with water source identification. In addition, the language in that section referring to the impact of mining on water supplies is cast in the past tense. It applies only to any water supply "which has been affected." The common dictionary definition of "replace" is "to place again" or "put back in place," *The American Heritage Dictionary of the English Language* (1981). Thus, by using the word "replace," the section requires restoration rather than prevention. In short, there must be a showing that a water supply has been affected by underground coal mining operations for the statute to impose a requirement of replacement. Although Water Users advocate reading section 1309a to authorize preventive measures to protect water resources, the plain language of the statute does not lend itself to that construction,

**2.** This section was added by the Energy Policy Act of 1992, Pub.L. No. 102–486, § 2504(a)(1), 106 Stat. 2776, 3104 (1992).

nor have Water Users identified any authority which persuasively supports that reading.[3]

■ With regard to the second issue, the evidence also justifies the Board's refusal to require water replacement as a remedy for past damage. During the proceedings, Water Users asserted that Co–Op's mining has contaminated and reduced the flow of water from the springs, which they claimed are hydrologically connected to the mine. At the hearing the Board received evidence from Water Users supporting their theory of an interconnected water system joining the permit area and the springs, and from Co–Op and the Division supporting the contrary theory that the springs and the permit area are in separate water systems. The Board found that there was no connection, and that Water Users had failed to prove that Co–Op has in fact damaged the springs. On this appeal, Water Users do not argue that the Board's factual finding is not supported by sufficient evidence. Given Water Users' failure to establish that water sources "have been affected" by "underground coal mining operations," the Board correctly concluded that section 1309a does not apply.

### III

The second issue we review concerns the propriety of the Board's making findings of fact and conclusions of law related to the Blind Canyon seam when the issue before the Board was whether to permit mining in the Tank seam. At the beginning of the hearing on Water Users' petition, the Board considered what evidence it would allow. The Board ruled that any evidence presented must be relevant to the proposed Tank seam operation, although evidence with regard to Co–Op's existing mining activities—e.g., those in the Blind Canyon seam—could be offered as background or foundation. During the hearing Water Users introduced a broad range of evidence about the geology and hydrology of the permit and spring area, including evidence relating to the Blind Canyon seam. Water Users argued that this evidence was relevant to the effect of mining the Tank seam for several reasons, all of which in some way relied on the theory that the Blind Canyon seam and the springs were part of a single connected water system. Despite multiple objections by Co–Op and the Division, none of Water Users' offered evidence was excluded as irrelevant. After Water Users concluded their evidentiary case, Co–Op and the Division responded with evidence showing that the springs and the coal seams were in fact in separate water systems and that as a result neither the past nor the proposed future mining activities could affect the springs.

■ Against this background, Water Users challenge the Blind Canyon findings on the ground that they exceed the Board's jurisdiction, violated their right to due process, and are arbitrary and capricious. We first discuss the jurisdictional argument: Water Users assert that the Board exceeded its jurisdiction when it made the Blind Canyon findings and conclusions, reasoning that because administrative agencies have only the jurisdiction conferred by statute, and because the statutes indicate that the scope of a Board hearing is set by the hearing notice, any issue not included in the notice is beyond the Board's jurisdiction. They urge that because the hearing notice referred only to the Tank seam and because the Board ruled that the scope of the hearing would be limited to the Tank seam, the Board lacked power to make the contested Blind Canyon findings and conclusions.

■ The jurisdictional argument is without merit. The requirement of notice under

---

3. Water Users suggest in their reply brief that the legislative history of the Surface Mining Act supports this proposition, but the case they cite merely states that the Act is generally aimed at the cumulative and long-term effects of mining. (Citing *National Wildlife Fed'n v. Lujan*, 21 Envtl. L. Rep. (Envtl.L.Inst.) 20125, 20128, 1990 WL 134495 (D.D.C.1990).) The only other authority offered on this point is a state case issued before the enactment of section 1309a which was decided under a state scheme that expressly gave mine operators the option to provide replacement water rather than preventing harm to water sources, all in the context of a specific mining operation which was expected to damage at least some water resources. *See Citizens Organized Against Longwalling v. Division of Reclamation*, 41 Ohio App.3d 290, 535 N.E.2d 687, 695–96, 699 (1987).

the argument Water Users assert goes to jurisdiction over the parties, not over the subject matter. 2 Am.Jur.2d *Administrative Law* § 288 (1994) (because notice goes to personal rather than subject matter jurisdiction, it may be waived). Subject matter jurisdiction, on the other hand, goes to the competence of a body to resolve a certain dispute. *See Salt Lake City v. Ohms,* 881 P.2d 844, 852 (Utah 1994) ("Subject matter jurisdiction is the authority and competency *of the court* to decide the case." (internal quotation marks omitted)). It is clear that in ruling on the ultimate issue of the permit revision for the Tank seam, the Board had subject matter jurisdiction. *See* Utah Code Ann. § 40–10–2 (1993 replacement) (Board intended to have jurisdiction over coal mining regulation under Surface Mining Act); *id.* § 40–10–6(4) (granting Board authority over coal mining permit approval). If the contested findings were in any way relevant to the issues before the Board, they were within the Board's authority to make. As the discussion below illustrates, the findings and conclusions were relevant to the Board's rulings on the ultimate issues.

 Water Users' claim that the challenged findings harm them is more accurately expressed by their due process challenge. At root, this complaint is that because they did not expect the Board to make findings and conclusions about the Blind Canyon seam (the scope of the hearing having been limited to the Tank seam by notice and ruling), they effectively will be foreclosed from opposing the renewal of the Blind Canyon permit without ever having an adequate opportunity to litigate those issues. In other words, they were not given adequate notice of or an adequate hearing on Blind Canyon seam issues and therefore were deprived of due process by the issuance of findings on those issues.

 The record does not support this claim. The arguments presented by Water Users at the hearing demonstrate that Water Users considered evidence relating to the Blind Canyon seam to be relevant to the ultimate issue of mining in the Tank seam. For example, Water Users urged the Board not to limit its consideration to "those aspects of the revision that are new." Although Water Users later argued to the Board that the Blind Canyon evidence was presented only to provide context and background for the Tank seam evidence, a review of some of the arguments they presented at the original hearing shows otherwise. In the course of the hearing, Water Users adduced evidence in support of the arguments that (1) water traveling through faults and cracks would come from above the Tank seam, pick up contaminants in the Tank seam, and proceed down through the Blind Canyon seam and into the springs; (2) water pumped up from the Blind Canyon seam for use in Tank seam mining would either be taken out of the mine with coal or carry contaminants with it back down to the Blind Canyon seam; (3) the permit revision application and the Division's evaluation of the application failed to satisfy statutory and regulatory requirements because they did not recognize and address damage already caused to the springs by mining; and (4) applicable federal law requires the provision of replacement water to ameliorate the damage done to the springs.[4]

These arguments are directly relevant to the ultimate issue: The first two arguments claim that mining operations in the Tank seam will cause direct harm to the springs, while the second two offer indirect reasons why the Tank seam permit revision should not be approved or should be modified before approval. In turn, the validity of these objections to the permit revision depends on

---

**4.** Water Users also raised two other major arguments: (1) that granting the permit would extend the life of the overall mining operation and therefore extend the duration of the harm caused by the existing mining operations, and (2) that the construction of a vehicle ramp from the Blind Canyon seam up to the Tank seam would result in the transfer of contaminants from the upper to the lower seam (and from the lower seam to the springs). The first argument ultimately lacks substantial relevance because, as the Board observed in its findings, denial of the permit revision would not end existing mining operations. The second argument was largely disposed of during the hearing, when it was established that no vehicle access between the levels was in fact planned. We note that even though the Board disposed of these arguments on other grounds, the Blind Canyon findings still serve to buttress the Board's rejection of them.

conclusions about the nature of the Blind Canyon seam—what relationship there is between the Tank and the Blind Canyon seams and whether a hydrologic link exists between the Blind Canyon seam and the springs. Far from being caught by surprise by the Board's consideration of Blind Canyon seam issues and evidence in deciding whether to approve Tank seam operations, Water Users actively supported the use of such evidence during the hearing and in their post-hearing memoranda. Furthermore, Water Users have adopted an argument before this Court which makes Blind Canyon seam conditions relevant: In support of their request for replacement water, Water Users renew to this Court the claim that pumping water from the Blind Canyon seam to the Tank seam for mining purposes will adversely affect the springs. Since that result follows only if water in the Blind Canyon seam eventually makes its way to the springs, that assertion alone would make the hydrology of the Blind Canyon seam and its relationship to the springs relevant.

In sum, Water Users presented arguments and evidence in the Tank permit revision proceedings that related to Blind Canyon seam conditions. The Board considered all the evidence presented and ruled on two ultimate issues: whether to allow Tank seam mining at all and whether to require Co-Op either to provide replacement water to remedy the claimed harm to the springs or to identify replacement water sources.[5] That the Board might have disposed of these ultimate issues on a narrower set of facts does not make it improper or unfair to include additional or alternative findings that respond to the bulk of the parties' argument and evidence and that give additional support for its decision. Water Users' right to notice and a fair hearing was not violated.

 Water Users' claim that the Board acted arbitrarily and capriciously in using evidence relating to the Blind Canyon seam in making its findings and conclusions depends upon the irrelevance of the evidence to the issue to be decided. Because we have concluded that the evidence was relevant, that claim also fails.

Affirmed.

ZIMMERMAN, C.J., and HOWE, DURHAM and RUSSON, JJ., concur.

---

**5.** Whatever the effect of the contested findings and conclusions may be on Co-Op's pending permit renewal application, the Board did not purport to resolve the renewal issue in its order.