2012 UT 73

**UTAH CHAPTER OF THE SIERRA CLUB, et al., Petitioners,**

v.

**BOARD OF OIL, GAS, AND MINING; and Division of Oil, Gas, and Mining, Respondents.**

and

**Alton Coal Development, LLC; and Kane County, Utah, Intervenors and Respondents.**

No. 20100969.

Supreme Court of Utah.

Oct. 30, 2012.

Walton Morris, Charlottesville, VA, for Utah Chapter of the Sierra Club, petitioner.

Sharon Buccino, Washington, D.C., for Natural Resources Defense Council, petitioner.

Stephen H.M. Bloch, Salt Lake City, for Southern Utah Wilderness Alliance, petitioner.

Mark Shurtleff, Att'y Gen., Steven F. Alder, Michael S. Johnson, Fredric J. Donaldson, Emily E. Lewis, Asst. Att'ys Gen., for respondents Board of Oil, Gas, and Mining and Division of Oil, Gas, and Mining.

Denise A. Dragoo, Alan L. Sullivan, James P. Allen, Salt Lake City, Bennett E. Bayer, Lexington, KY, for intervenor and respondent Alton Coal Development, LLC.

Jim R. Scarth, Kent A. Burggraaf, Kanab, for intervenor and respondent Kane County, Utah.

Justice PARRISH, opinion of the Court:

## INTRODUCTION

¶ 1 Petitioners appeal a decision of the Board of Oil, Gas, and Mining (Board). The Board affirmed the approval of Alton Coal Development's (ACD) mining permit, which allowed ACD to conduct surface coal mining operations at the Coal Hollow Mine. Petitioners argue that the Board erred in affirming ACD's mining permit because the permit application was deficient in several respects. We disagree and affirm the Board's decision.

## BACKGROUND

¶ 2 This appeal concerns ACD's permit application seeking to conduct surface and coal mining operations at the Coal Hollow Mine in Kane County, Utah, on privately-owned, non-federal lands. Petitioners include the Utah Chapter of the Sierra Club, Southern Utah Wilderness Alliance, Natural Resources Defense Council, and National Parks Conservation Association (collectively, Petitioners). Petitioners challenge the Board's decision, which affirmed the approval of ACD's mining permit application by the Division of Oil, Gas, and Mining (Division).

¶ 3 In June 2007, ACD submitted a permit application to the Division, seeking to conduct surface mining operations on private land at the Coal Hollow Mine in Kane County, Utah. The permit application was submitted pursuant to the Utah Coal Mining and Reclamation Act (Utah Coal Mining Act or Mining Act). *See* UTAH CODE §§ 40–10–1 to 40–10–30. The Division initially denied ACD's application, reasoning that it was incomplete. Later, ACD submitted supplemental information and, in March 2008, the Division determined that ACD's application was administratively complete. The Division then began its technical review of the application. In addition to its technical review, the Division convened an informal conference in June at the Alton City Hall to receive public comment on the mining permit. After receiving public comment, fully reviewing ACD's permit application, and conducting its own technical review, the Division approved ACD's permit application in October 2009.

¶ 4 In November, Petitioners challenged the Division's approval of ACD's permit application by filing a Request for Agency Action and Request for a Hearing with the Board. Petitioners alleged that the Division had failed to follow the necessary regulatory and statutory procedures when it approved ACD's permit application. Specifically, Petitioners urged the Board to vacate the approval of ACD's mining permit, arguing that ACD's permit application contained thirty-two deficiencies that the Division had overlooked.

¶ 5 The Board considered several prehearing motions and allowed the parties to conduct discovery. Petitioners took depositions of the Division and ACD, and ACD and the Division deposed Petitioners' expert witnesses. ACD also gave Petitioners access to the Coal Hollow Mine permit area, where they were allowed to inspect, measure, survey, photograph, test, and sample the permit site. The Board accepted briefing from all parties, including the Petitioners, ACD, Kane County, and the Division. Prior to the hearing, Petitioners narrowed their focus to seventeen arguments. The Board conducted a full evidentiary hearing spanning five days in April and June 2010 where the parties had the opportunity to present exhibits and witnesses and cross-examine opposing witnesses.

¶ 6 After the hearing, the Board took the case under advisement. The Board issued an interim order announcing its decision to affirm the Division's approval of ACD's mining permit. In August 2010, the Board received Petitioners' objections to the proposed findings of fact and conclusions of law. It entered a final order on November 22, 2010. In its final order, the Board denied Petitioners' claims and affirmed the Division's decision to approve ACD's mining permit. The Board's final order contained extensive factual findings and legal conclusions on all seventeen of Petitioners' claims.

¶ 7 Petitioners appealed the Board's decision to this court and sought a stay to prevent commencement of mining operations at the Coal Hollow Mine. We denied the request for a stay. We have jurisdiction under section 78A–3–102(3)(e)(iv) of the Utah Code. Additionally, the Utah Administrative Procedures Act and the Utah Coal Mining Act explicitly grant this court the authority to review decisions of the Board. UTAH CODE §§ 40–10–14(6)(a), 40–10–30(3), 63G–4–403(1).

### STANDARD OF REVIEW

¶ 8 Under the Utah Coal Mining Act, "[j]udicial review of adjudicative proceedings . . . is governed by [the Utah Administrative Procedures Act (UAPA) ] and provisions of [the Mining Act]. . . ." UTAH CODE § 40–10–30(1); *see also id.* § 63G–4–102(1). The Mining Act grants this court explicit authority to set aside the Board's decision if it is found to be:

(a) unreasonable, unjust, arbitrary, capricious, or an abuse of discretion;

(b) contrary to constitutional right, power, privilege, or immunity;

(c) in excess of statutory jurisdiction, authority, or limitations;

(d) not in compliance with procedure required by law;

(e) based upon a clearly erroneous interpretation or application of the law; or

(f) as to an adjudicative proceeding, unsupported by substantial evidence on the record.

*Id.* § 40–10–30(3).

¶ 9 Under UAPA, we review an agency's general interpretations of law for correctness, "granting little or no deference to the agency's determination." *Utah Chapter of the Sierra Club v. Air Quality Bd.*, 2009 UT 76, ¶ 13, 226 P.3d 719 (internal quotation marks omitted). Under the Mining Act's provisions, general interpretations of law include constitutional questions and rulings concerning the Board's jurisdiction or authority. *See* UTAH CODE § 40–10–30(3)(b)–(c); *see also Associated Gen. Contractors v. Bd. of Oil, Gas, & Mining*, 2001 UT 112, ¶ 18, 38 P.3d 291 (noting that we review an agency's interpretation of general questions of law for correctness and that general questions of law "include constitutional questions, rulings concerning an agency's jurisdiction or authority, interpretations of common law principles, and interpretations of statutes unrelated to the agency").

¶ 10 The Legislature has given the Board explicit authority and wide latitude in interpreting the operative provisions of the Mining Act. *See* UTAH CODE §§ 40–10–6, 40–10–30(3)(e). Therefore, this court may set aside the Board's legal conclusions and interpretations of the Mining Act only if those conclusions are "based upon a clearly erroneous interpretation or application of the law." *Id.* § 40–10–30(3)(e); *see also Associated Gen. Contractors*, 2001 UT 112, ¶ 18, 38 P.3d 291 (noting that we give deference to the Board's conclusions regarding "the agency's interpretation of the operative provisions of the statutory law it is empowered to administer" (alterations omitted) (internal quotation marks omitted)). We have previously noted that because "the [L]egislature has delegated to the Board regulatory authority over ... 'the reclamation of lands affected by mining operations,' " the Board's "expertise and authority place [it] in a better position than the judiciary to interpret terms specific to the mining industry...." *Associated Gen., Contractors*, 2001 UT 112, ¶ 19, 38 P.3d 291 (quoting UTAH CODE § 40–8–7(1)(d) (2001)).

¶ 11 With respect to the Board's factual findings, we give it great deference and will only set them aside where they are "unsupported by substantial evidence on the record." UTAH CODE §§ 40–10–30(3)(f), 63G–4–403(4)(g); *see also Associated Gen. Contractors*, 2001 UT 112, ¶¶ 20–21, 38 P.3d 291. "Under the Utah Administrative Procedures Act, substantial evidence is that quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *Associated Gen. Contractors*, 2001 UT 112, ¶ 21, 38 P.3d 291 (internal quotation marks omitted). "[I]n determining whether a rule is supported by substantial evidence, courts must decide if the relevant findings were reasonable and rational, although such an assessment does not constitute a de novo review or a reweighing of the evidence." *Id.* (internal quotation marks omitted); *see also* UTAH CODE § 40–10–30(3) (noting that "[a]n appeal from an order of the board ... is not a trial de novo"). Thus, the Board's decisions "should be upheld if the quantum and quality of evidence the Board relied upon was adequate to convince a reasonable mind to support [the agency's] conclusion." *Associated Gen. Contractors*, 2001 UT 112, ¶ 22, 38 P.3d 291 (alteration in original) (internal quotation marks omitted).

¶ 12 "On appeal from an order of an administrative agency, the appealing party bears the burden of demonstrating that the agency's factual determinations are not supported by substantial evidence and we state the facts and all legitimate inferences drawn therefrom in the light most favorable to the agency's findings." *Ivory Homes, Ltd. v. Utah State Tax Comm'n*, 2011 UT 54, ¶ 11, 266 P.3d 751 (alterations omitted) (internal quotation marks omitted). And "the party challenging the rule's findings must marshal all of the evidence supporting the findings and show that despite the supporting facts, the ... findings are not supported by substantial evidence." *Associated Gen. Contractors*, 2001 UT 112, ¶ 21, 38 P.3d 291 (alteration in original) (internal quotation marks omitted).

¶ 13 On mixed questions of fact and law, the Board similarly receives great deference. We will overturn the Board's decision only

where its conclusions are "unreasonable, unjust, arbitrary, capricious, or an abuse of discretion." UTAH CODE § 40–10–30(3)(a); *see also Associated Gen. Contractors,* 2001 UT 112, ¶ 18, 38 P.3d 291 (noting that on "mixed findings of fact and law ... agency findings must be rationally based and are set aside only if they are imposed arbitrarily and capriciously or are beyond the tolerable limits of reason") (internal quotation marks omitted). This is because the Mining Act gives the Board great deference both on its "interpretation or application of the law" and its factual findings. UTAH CODE § 40–10–30(3)(e)–(f); *see also Associated Gen. Contractors,* 2001 UT 112, ¶ 18, 38 P.3d 291.

¶ 14 We grant great deference to the Board's conclusions regarding the Mining Act for several reasons. The language of the Mining Act explicitly grants the Board considerable discretion to enact, interpret, and apply its provisions, and the Mining Act explicitly instructs this court to give deference to the Board's legal interpretations and application of the Mining Act. *See* UTAH CODE § 40–10–2(1) (noting that "[i]t is the purpose of [the Utah Coal Mining Act] to ... grant to the Board ... the necessary authority to assure exclusive jurisdiction over nonfederal lands ... in regard to regulation of coal mining and reclamation operations"); *id.* § 40–10–2(6) (noting the Legislature's intent to "exercise the full reach of state constitutional powers to insure the protection of the public interest through effective control of surface coal mining operations and efficient reclamation of abandoned mines"). The Legislature also has vested the Board and Division with significant powers and functions, including broad discretion in promulgating rules, establishing standards and permitting procedures, employing technical and legal staff and "do[ing] all ... things and tak[ing] such other actions retroactively or otherwise within the purposes of this chapter as may be necessary to enforce [the Mining Act's] provisions." *Id.* § 40–10–6(9).

¶ 15 Additionally, the Board possesses expertise concerning the Mining Act. Specifically, the Act requires that the Board must be composed of citizens with specific knowledge and expertise in mining, environmental, oil and gas, and royalty interest matters. *See id.* § 40–6–4(2). This places the Board "in a better position than the courts to assess the law due to its experience with the relevant subject matter." *Associated Gen. Contractors,* 2001 UT 112, ¶ 18, 38 P.3d 291. Accordingly, we apply a deferential standard of review and we overturn the Board's interpretation and application of the Mining Act only where the Board's conclusions are arbitrary or capricious.

¶ 16 This case presents several issues. We address the specific standard of review applicable to each issue in the individual sections below.

## ANALYSIS

¶ 17 On appeal, Petitioners argue that the Board's decision to affirm the Division's approval of ACD's mining permit was erroneous for three reasons. First, Petitioners argue that the Board erred in affirming the Division's decision because the Division failed to give adequate consideration to the cultural and historic resources in the "adjacent area." Second, Petitioners argue that the Board erred because the Division's Cumulative Hydrological Assessment did not satisfy the statutory requirements. Finally, Petitioners argue that the Board erred in affirming the Division's approval of ACD's mining permit because the Division's hydrologic monitoring plan was insufficient. We disagree and affirm the Board's decision.

## I. THE BOARD PROPERLY CONCLUDED THAT THE DIVISION GAVE ADEQUATE CONSIDERATION TO CULTURAL AND HISTORIC RESOURCES IN THE "ADJACENT AREA"

¶ 18 Petitioners argue that the Board's decision was erroneous because the Division failed to consider the Coal Hollow Mine's impact on cultural and historic resources in the "adjacent area" as required by the Mining Act. The dispute on this issue stems from the Board's interpretation of "adjacent area." We review the Board's interpretation of "adjacent area" under the clearly erroneous standard because it presents issues regard-

ing the Board's interpretation and application of the Mining Act. *See* UTAH CODE § 40–10–30(3)(e). This deferential standard of review is especially appropriate here because the Board "possesses expertise concerning the operative provisions at issue," and the Board is therefore "in a better position than the courts to assess the law due to its experience with the relevant subject matter," including agency definitions.[1] *See Associated Gen. Contractors v. Bd. of Oil, Gas & Mining*, 2001 UT 112, ¶ 18, 38 P.3d 291.

¶ 19 The Utah Coal Mine Permitting Rules provide several requirements for mining permit applications. UTAH ADMIN. CODE R645–301–400; *see also id.* R645–301–411.140 to –411.144. Under these rules, the permit application must identify "the nature of cultural and historic resources listed or eligible for listing ... and known archeological sites within the permit and adjacent areas." *Id.* R645–301–411.140, –411.141. The regulation defines "adjacent area" as "the area outside the permit area where a resource or resources ... are or reasonably could be expected to be adversely impacted by proposed coal mining and reclamation operations...." *Id.* R645–100–200.

¶ 20 Petitioners read this definition broadly, arguing that it required ACD and the Division to consider any cultural or historic resources, including those located entirely outside the permit area. Accordingly, Petitioners argue that the Board's decision was erroneous because the Division failed to identify any cultural and historic resources located entirely outside of the permit area. ACD and the State respond that the statute cannot be read so broadly. Specifically, they contend that the definition of "adjacent area" only extends to cultural and historic resources that are likely to be affected by coal mining operations. According to ACD, "if an historic property is unlikely to be affected by coal mining operations, it is outside the adjacent area by definition."

¶ 21 After evaluating the plain language of the statute, the Board determined that "[t]he Division complied with [the Mining Act] by evaluating impacts on every eligible site where impacts from mining and reclamation *could be reasonably expected.*" (Emphasis added.) This legal interpretation of "adjacent area" is supported by the plain language of the Mining Act.

¶ 22 As noted above, the Mining Act requires the permit applicant and the Division to consider cultural and historical resources in the "adjacent area." *Id.* R645–301–411.140, –411.141. But the definition of "adjacent area" only requires the Division to identify cultural and historic resources that "*are or reasonably could be expected to be adversely impacted* by proposed coal mining and reclamation operations." *Id.* R645–100–200 (emphasis added). Thus, the plain language of the statute supports the Board's legal conclusion. The statute cannot reasonably be interpreted to require, as Petitioners argue, that the Division and ACD consider any and every cultural and historic resource outside the permit area, including those that will not be affected by the proposed mining operations. Thus, the Board's legal interpretation of "adjacent area" is supported by the plain language of the Mining Act and the Board's legal interpretation of the Mining Act is not clearly erroneous.

¶ 23 Petitioners raise three additional arguments relating to the Division's evaluation of the cultural and historic resources in the "adjacent area." Petitioners first argue that the Board's factual finding that the Division identified and considered cultural and historic resources in the "adjacent area" was not supported by substantial evidence. Second, Petitioners contend that the Division's failure to protect the Panguitch National Historic District highlights this failure. Finally, Petitioners claim that the Division failed to receive certain concurrences from the State Historic Preservation Officer (SHPO) with respect to the Division's evaluation of the "adjacent area." ACD and the State argue that the Board acted well within its discre-

---

1. Indeed, the Board notes that, by statutory design, it "possesses expertise in certain technical areas including geology, ecological and environmental matters, and mining." *See* UTAH CODE § 40–6–4(2) (requiring that the Board must include members who are individually knowledgeable regarding mining, environmental, oil and gas, or royalty interest matters).

tion in affirming the decision of the Division. We agree with ACD and the State.

### A. The Board Reasonably Concluded that ACD's Mining Permit Adequately Identified and the Division Properly Considered Cultural and Historic Resources in the "Adjacent Area"

■ ¶ 24 Petitioners contend that the Board's factual finding that the Division adequately considered cultural and historic resources in the "adjacent area" was not supported by substantial evidence. The Board's factual findings are reviewed under a "substantial evidence" standard. UTAH CODE § 40–10–30(3)(f). Under this standard, we give great deference to the Board's factual findings, setting aside the Board's action only where its factual findings are "unsupported by substantial evidence on the record." *Id.; see also Associated Gen. Contractors,* 2001 UT 112, ¶ 20, 38 P.3d 291. However, the Board's ultimate conclusion that the Division adequately considered cultural and historic resources in the adjacent area presents a mixed question of fact and law because it required the Board to interpret the definition of "adjacent area" and apply it to the facts of this case.[2] Therefore, the Board's conclusions on this issue "must be rationally based and are set aside only if they are imposed arbitrarily and capriciously or are beyond the tolerable limits of reason." *Associated Gen. Contractors,* 2001 UT 112, ¶ 18, 38 P.3d 291 (internal quotation marks omitted); *see also* UTAH CODE § 40–10–30(3)(a).

¶ 25 The Board interpreted the definition of "adjacent area," evaluated the Division's findings, and concluded that "[t]he Division complied with [the Mining Act] by evaluating impacts on every eligible site where impacts from mining and reclamation could be *reasonably expected.*" As noted above, the Board's legal conclusion interpreting the definition of "adjacent area" is supported by the plain language of the statute. *See supra* ¶¶ 19–22. And the Board's factual findings supported its conclusion that the Division complied with the statutory requirements of the Mining Act. The Board found that "[d]ocumentary evidence admitted at the hearing show[ed] that all of the permit area, and more than 3000 acres of surrounding area, were surveyed for the presence of archaeological sites and cultural resources in Cultural Resource Inventories." And the Board found that "[t]he cultural resource surveys with their accompanying maps show[ed] that over 90 archaeological sites were identified by [ACD] at locations *outside the permit area.*" The Board concluded that while the Division had "evaluated sites located in the area adjacent to the permit boundary for eligibility and potential adverse effect," the "[e]vidence produced at [the] hearing and available in the record show[ed] that sites located entirely beyond the permit boundary [could not] reasonably be expected to be adversely impacted by coal mining and reclamation operations."

¶ 26 The Board's factual findings are substantially supported by the record. ACD commissioned a series of Cultural Resource Inventories of the area surrounding the Coal Hollow Mine. Together, these surveys located 91 sites deemed eligible for inclusion on the National Register of Historic Places. The Division prepared a list of sites that would be or reasonably could be affected by the proposed mining and sent the list to SHPO for concurrence, which it has provided. This evidence "is adequate to convince a reasonable mind to support" the Board's conclusion. *Associated Gen. Contractors,* 2001 UT 112, ¶ 21, 38 P.3d 291 (internal quotation marks omitted). We therefore determine that the Board's conclusions were "rationally based," and were not imposed "arbitrarily [or] capriciously ... beyond the tolerable limits of reason," and we affirm the Board's decision. *Id.* ¶ 18 (internal quotation marks omitted).

### B. The Board Reasonably Concluded that the Division Adequately Considered the Panguitch National Historic District

■ ¶ 27 Petitioners argue that the Board erred in affirming the Division's approval of

---

2. Petitioners and ACD present this issue solely as a factual determination by the Board that should be evaluated under our "substantial evidence" standard. But the parties' arguments rely heavily on the Board's interpretation of the phrase "adjacent area." Thus, this issue encompasses not only the Board's factual determination regarding the Division's evaluation, but also the agency's interpretation of its own definitions and its application of the law to the facts of this case.

ACD's mining permit because the Division failed to consider and protect the Panguitch National Historic District (District). Petitioners argue that a potential hauling route from the mine may include U.S. Highway 89, which runs through the District located approximately thirty miles away from the Coal Hollow Mine. And they argue that the Division's failure to consider the District demonstrates that the Division did not adequately identify historic and cultural resources in the "adjacent area." ACD and the State respond that the Division did not need to provide mitigation information for the District because the Division properly determined that the District would not be affected by the proposed mining operations. ACD and the State maintain that the District does not fall under the Mining Act's provisions because it is unlikely to be affected by the coal mining operations. We agree.

¶ 28 Whether the Division properly considered the District in its evaluation of the cultural and natural resources is a question of fact that is reviewed under the substantial evidence standard. *See* UTAH CODE § 40–10–30(3)(f); *see also Associated Gen. Contractors,* 2001 UT 112, ¶¶ 20–21, 38 P.3d 291. And whether the Division properly interpreted the definition of "adjacent area" and applied it to the District presents a mixed question of law and fact. Therefore, "the agency's interpretation ... [and] agency findings must be rationally based and are set aside only if they are imposed arbitrarily and capriciously or are beyond the tolerable limits of reason." *Associated Gen. Contractors,* 2001 UT 112, ¶ 18, 38 P.3d 291 (alterations omitted) (internal quotation marks omitted).

¶ 29 The Board and the Division considered evidence regarding the District and concluded that it did not fall within the statutory definition of "adjacent area." "Adjacent area" includes "the area outside the permit area where a resource or resources ... *are or reasonably could be expected to be adversely impacted* by proposed coal mining and reclamation operations...." UTAH ADMIN. CODE R645–100–200 (emphasis added). As discussed above, the Board's interpretation

of this definition was reasonable. *See supra* ¶¶ 19–22. After interpreting the statute, the Board found that "[t]he evidence did not establish that any coal mining and reclamation operation of the Coal Hollow Mine could *reasonably be expected to adversely impact* the [District]." (Emphasis added.) And the Board therefore concluded that under the statutory definition, the District was "not located within the ... adjacent area for cultural resources by virtue of the possibility that it could be impacted by truck traffic hauling coal from the mine."

¶ 30 Petitioners have not challenged any of the legal conclusions or the factual findings regarding the District. They merely argue that the Division's failure to protect the District highlights the Division's failure to consider cultural and historic resources in the "adjacent area." But Petitioners have utterly failed to marshal the Board's factual findings with respect to the District.[3] We previously have held that "the party challenging the rule's findings must marshal all of the evidence supporting the findings and show that despite the supporting facts, the ... findings are not supported by substantial evidence." *Associated Gen. Contractors,* 2001 UT 112, ¶ 21, 38 P.3d 291 (alteration in original) (internal quotation marks omitted). Where a party fails to marshal the evidence, we may presume the evidence supports the Board's conclusion and affirm the Board's decision. *See id.* ¶ 34 (affirming a decision that the Board's ruling was supported by substantial evidence where the petitioners "utterly fail[ed] to marshal the evidence in support of the Board's finding").

¶ 31 "On appeal from an order of an administrative agency, the appealing party bears the burden of demonstrating that the agency's factual determinations are not supported by substantial evidence and we state the facts and all legitimate inferences drawn therefrom in the light most favorable to the agency's findings." *Ivory Homes, Ltd. v. Utah State Tax Comm'n,* 2011 UT 54, ¶ 11, 266 P.3d 751 (alterations omitted) (internal quotation marks omitted). The record demonstrates that during the five-day evidentiary

---

**3.** In contrast, the Petitioners did marshal the Board's factual findings regarding the SHPO concurrences and the Division's analysis of the adjacent area.

hearing, the Board heard and adequately considered evidence regarding the District before it concluded that the District did not fall within the statutory definition of "adjacent area." Therefore, viewing the facts in the light most favorable to the Board's findings, we cannot conclude that the Board acted arbitrarily or capriciously, and we affirm the decision of the Board on this issue.

C. *The Board Reasonably Concluded that ACD's Mining Permit Adequately Described and the Division Properly Considered ACD's Coordination Efforts with SHPO*

■ ¶ 32 Finally, Petitioners argue that the Board erred in affirming the Division's approval of ACD's mining permit because ACD did not obtain all proper concurrences from the SHPO. Specifically, Petitioners argue that the "SHPO did not concur in any evaluation of an adjacent area" because two sites were omitted from the original request for SHPO concurrence. ACD and the State respond that substantial evidence in the record supports the Board's conclusion that ACD properly coordinated with SHPO regarding mitigation of the necessary cultural sites in the adjacent area.

¶ 33 Whether ACD and the Division properly consulted with the SHPO presents a question of fact that is reviewed under the substantial evidence standard. *See* UTAH CODE § 40–10–30(3)(f); *see also Associated Gen. Contractors,* 2001 UT 112, ¶ 20–21, 38 P.3d 291. And whether the Division properly interpreted the definition of "adjacent area" and applied it to the issue of whether ACD received the proper SHPO concurrences regarding resources in the adjacent area presents a mixed question of law and fact. Therefore the Board's decision must be rationally based, and we will only overturn the Board's conclusion on this issue if it is arbitrary and capricious. *Associated Gen. Contractors,* 2001 UT 112, ¶ 18, 38 P.3d 291; *see also* UTAH CODE § 40–10–30(3)(a).

¶ 34 Utah's Mining Act requires that "each agency shall ... provide the [SHPO] with a written evaluation of the expenditure's or undertaking's effect on the historic property." UTAH CODE § 9–8–404(1)(a)(ii). And

under the Utah Coal Mine Permitting Rules, a permit applicant's narrative must "describe coordination efforts with and present evidence of clearances by the SHPO." UTAH ADMIN. CODE R645–301–411.142.

¶ 35 The Board made factual findings that ACD and the Division complied with the statute and received the proper SHPO concurrences. Specifically, the Board found that "[t]he evidence did not establish that any site in the permit area had been overlooked or omitted from the determination of eligibility and effect" and that "[t]he evidence did not establish that SHPO clearance omitted any *affected site."* (Emphasis added.) The Board noted that ACD and the Division worked with the SHPO in preparing a Cultural Resources Management Plan and that "[t]he record contain[ed] correspondence between the Division and SHPO showing that the Division evaluated the effects of the mining operations on all sites initially known to the Division within the permit area, prepared a 'determination of eligibility and effect', and requested SHPO concurrence on this determination." The Board also found that "[t]he Division obtained the concurrence of SHPO on their eligibility and effect determination" and that after ACD informed the Division of two additional sites, those sites were also evaluated by the Division and had "received concurrence by SHPO."

¶ 36 These factual findings demonstrate that ACD followed the statutory requirement that it "describe [its] coordination efforts with and present evidence of clearances by the SHPO." *Id.* And these factual findings are supported by substantial evidence in the record. At the evidentiary hearing, the Board examined five separate exhibits that demonstrated the Division's evaluations regarding cultural and historic resources in the adjacent areas, as well as the corresponding SHPO concurrences for each of these evaluations. This evidence is "adequate to convince a reasonable mind to support [the Board's] conclusion." *Associated Gen. Contractors,* 2001 UT 112, ¶ 22, 38 P.3d 291 (internal quotation marks omitted).

¶ 37 Based on these factual determinations, the Board concluded that "[t]he weight of

evidence supported the Division's actions" with respect to the SHPO concurrences. The Board also concluded that ACD's "permit application contain[ed] evidence of the required consultation with SHPO" and that "[o]mission of two sites from those identified in the Divison's pre-approval consultations with SHPO was fully remedied." In light of these reasonable conclusions, we cannot determine that the Board acted capriciously or arbitrarily. We therefore uphold the Board's conclusion granting ACD's mining permit.

## II. THE BOARD PROPERLY CONCLUDED THAT THE DIVISION'S CUMULATIVE HYDROLOGICAL IMPACT ASSESSMENT SATISFIED UTAH'S REQUIREMENTS

¶ 38 Petitioners also argue that the Board erred in upholding the Division's Cumulative Hydrologic Impact Assessment (CHIA). Specifically, Petitioners argue that the Division erred as a matter of law in performing its CHIA without formulating or applying site specific "material damage criteria." ACD and the State respond that Petitioners' argument ignores the plain language of the Utah Coal Act and Utah's primacy over these matters. According to ACD and the State, Petitioners' argument relies on a misinterpretation of a federal provision that does not apply to Utah and that has been rejected by federal regulatory authorities. Finally, ACD and the State argue that the Board acted within its discretion because the criteria established by the Division satisfy Utah law. We agree with ACD and the State.

¶ 39 Whether the Division was required to establish "material damage criteria" under the applicable statutes presents issues regarding the Board's legal interpretation and application of Utah's Mining Act, which we review under a "clearly erroneous" standard. *See* UTAH CODE § 40–10–30(3)(e). Additionally, whether the Board correctly affirmed the Division's CHIA raises a mixed question of fact and law because it required the Board to apply its legal interpretation of the Mining Act to the facts of this case. Conclusions based on mixed questions of fact and law must be reasonable, and will only be over-

turned if they are arbitrary and capricious. *See Associated Gen. Contractors v. Bd. of Oil, Gas & Mining,* 2001 UT 112, ¶¶ 18–19, 38 P.3d 291; *see also* UTAH CODE § 40–10–30(3)(a). The Board has "been granted explicit ... discretion under the [Mining Act]" and it "possesses expertise concerning the operative provisions at issue." *Associated Gen. Contractors,* 2001 UT 112, ¶ 18, 38 P.3d 291. Therefore, we give deference to the Board's conclusions because it is "in a better position than the courts to assess the [Utah Coal Mining Act] due to its experience with the relevant subject matter." *Id.*

¶ 40 Petitioners argue that the Board erred in affirming the Division's CHIA because the Division has an "obligation to conform its interpretation of the Utah CHIA regulations to [the federal Office of Surface Mining's] interpretation of their federal counterparts." This argument ignores the statutory scheme, which grants Utah exclusive jurisdiction over mining on nonfederal lands.

¶ 41 In 1977, Congress enacted the Surface Mining Control and Reclamation Act (SMCRA). 30 U.S.C. §§ 1201–1328. SMCRA took a "cooperative federalism" approach to surface coal mining by "establish[ing] ... 'minimum national standards' ... and encourag[ing] the States, through an offer of exclusive regulatory jurisdiction, to enact their own laws incorporating these minimum standards, as well as any more stringent, but not inconsistent, standards that they might choose." *Bragg v. W. Va. Coal Ass'n,* 248 F.3d 275, 288 (4th Cir.2001) (citing 30 U.S.C. § 1255(b)). Under SMCRA, the Secretary of the Interior, acting through the Office of Surface Mining Reclamation and Enforcement (OSM), reviews and either approves or disapproves of State regulatory programs. 30 U.S.C. § 1211(c)(1); *see also Bragg,* 248 F.3d at 288. The Secretary may not approve a State's program or any amendments to a State's program unless, at a minimum, they are no less stringent than SMCRA and no less effective than the federal implementing regulations. 30 U.S.C. § 1253(b); 30 C.F.R. §§ 732.15(a), 730.5, 732.17(h)(10); *see also Bragg,* 248 F.3d at 288–89. However, once a State's program is approved, it becomes the exclusive authority

over mining in that State. 30 U.S.C. §§ 1253(a), 1254(a); *see also Bragg*, 248 F.3d at 289. "[B]ecause the regulation is mutually exclusive, either federal law or State law regulates coal mining activity in a State, but not both simultaneously." *Bragg*, 248 F.3d at 289; *see also* 30 U.S.C. §§ 1253(a), 1254(a).

¶ 42 Utah is a primacy state that retains "exclusive jurisdiction over nonfederal lands" in the regulation of surface mining operations. UTAH CODE § 40–10–2(1); *see also Castle Valley Special Service Dist. v. Utah Bd. of Oil, Gas & Mining*, 938 P.2d 248, 251–52 (Utah 1996). Utah has been a primacy state since 1981, when OSM approved Utah's regulatory program and the Utah Coal Program has been the operative program regulating coal mining in the state. 30 C.F.R. § 944.10 (2009); 46 Fed.Reg. 5,899 (Jan. 21, 1981) (granting primacy); 60 Fed. Reg. 37,002 (July 19, 1995) (same); 63 Fed. Reg. 63,608, 63,608–10 (Nov. 16, 1998) (same). Because Utah has established primacy in coal mining regulations, "[s]tate statutes and regulations thus become the direct authority for regulating coal mining" and are the operative law interpreted by Utah courts. *Castle Valley Special Service Dist.*, 938 P.2d at 251. And "although we are free to consider the interpretation of a federal agency, we have no obligation to defer to that interpretation." *State v. Mooney*, 2004 UT 49, ¶ 25, 98 P.3d 420; *see also Bragg*, 248 F.3d at 295 ("[W]hen a State's program has been approved by the Secretary of the Interior, we can look only to State law on matters involving the enforcement of the minimum national standards.").

¶ 43 Under Utah's Coal Mining Act, the Division must prepare a CHIA that assesses the "probable cumulative impact" of the proposed mine when combined with any existing coal mines and all anticipated mines in the area. UTAH CODE §§ 40–10–10(2)(c)(i), 40–10–11(2)(c); UTAH ADMIN. CODE R645–301–729. The CHIA is prepared based on the applicant's statement of the probable hydrologic consequences of mining and its measurements of the water resources in the permit and adjacent areas. UTAH CODE § 40–10–10(2)(c)(i); UTAH ADMIN. CODE R645–301–

728 to –729. The Board's rules require that the CHIA shall be "sufficient to determine, for purposes of permit approval whether the proposed coal mining and reclamation operation has been designed to prevent material damage to the hydrologic balance outside the permit area." UTAH ADMIN. CODE R645–301–729.100; *see also* UTAH CODE § 40–10–10(2)(c).

¶ 44 Petitioners argue that the Board erred in its assessment of the CHIA because the Division did not create a "material damage criteria" as a baseline to measure against future water quality levels surrounding the Coal Hollow Mine. The Board concluded that it "does not construe any provision of its rules to require explicitly designating numeric material damage criteria in the CHIA." This legal conclusion is supported by the statute.

¶ 45 Neither Utah's Coal Act nor Utah's Administrative Code specifies that the CHIA must include a "material damage criteria." *See* UTAH ADMIN. CODE R645–301–729.100; UTAH CODE § 40–10–10(2)(c)(i). The entirety of the regulations governing preparation and the contents of a CHIA are contained in a single administrative rule. This rule states:

> The Division will provide an assessment of the probable cumulative hydrologic impacts of the proposed coal mining and reclamation operation and all anticipated coal mining and reclamation operations upon surface- and ground-water systems in the cumulative impact area. The CHIA will be sufficient to determine, for purposes of permit approval whether the proposed coal mining and reclamation operation has been designed to prevent material damage to the hydrologic balance outside the permit area. The Division may allow the applicant to submit data and analyses relevant to the CHIA with the permit application.

UTAH ADMIN. CODE R645–301–729.100. And the relevant provision of the Utah Coal Mining Act states:

> A permit application shall ... include a
>
> · · ·
>
> (A) determination of the probable hydrologic consequences of the mining and reclamation operations ... ;

(B) determination of the quantity and quality of water in surface[-] and ground[-]water systems . . .; and

(C) collection of sufficient data for the mine site and surrounding areas so that an assessment can be made by the [D]ivision of the probable cumulative impacts of all anticipated mining in the area upon the hydrology of the area and, particularly, upon water availability.

UTAH CODE § 40–10–10(2)(c)(i). Thus, neither the Utah Administrative Code nor Utah's Mining Act requires that the Division establish a "material damage criteria" as part of the CHIA process. And neither the Utah Administrative Act nor Utah's Coal Program define "material damage criteria" or "material damage" as used in the CHIA. *See id.* R645–100–200; UTAH CODE §§ 40–10–10 to – 11. Therefore, we cannot conclude that the Board's legal determination was clearly erroneous, and we affirm the Board's conclusion on this issue.

¶ 46 On appeal, Petitioners urge this court to look to several nonbinding federal regulatory sources to conclude that Utah's CHIA requirement is insufficient. Specifically, Petitioners cite to OSM's commentary on proposed revisions to West Virginia's regulatory program, which states that "SMCRA requires regulatory authorities to determine whether proposed operations have been designed to prevent material damage to the hydrologic balance outside the permit area" and that "[t]his provision inherently requires the use of guidelines or criteria, since even case-by-case determinations require the application of some type of damage threshold and impact measures." West Virginia Regulatory Program, 73 Fed.Reg. 78,974 (Dec. 24, 2008) (to be codified at 30 C.F.R. § 948).

¶ 47 Petitioners' argument is flawed in several respects. As noted above, "[s]tate statutes and regulations [are] the direct authority for regulating coal mining" and are the operative law to be interpreted by Utah courts, and we need not look to the federal guidelines. *Castle Valley Special Service Dist.*, 938 P.2d at 251; *see supra* ¶¶ 41–42. Moreover, Petitioners overstate the federal "mandate" for material damage criteria. The federal guidelines cited by Petitioners

specifically state that "in the 25 years since the hydrology rules were revised, OSM has not put States on notice . . . of an obligation to establish material damage criteria. . . ." 73 Fed.Reg. 78,974. While OSM encourages "some type of damage threshold and impact measures," *id.*, OSM has consistently left the exact form and effect of these thresholds within the ambit of state discretion and flexibility. *See, e.g.,* 48 Fed.Reg. 43,955, 43,973 (Sep. 26, 1983).

¶ 48 The Board concluded that the Division's CHIA comported with Utah's regulatory requirements. The Board made the factual finding that ACD's mine "was designed to prevent material damage to the hydrologic balance outside the permit area." Specifically, the Board found that "the CHIA prepared by the Division was adequate because it made a sound scientific and technical judgment that the mine was designed to prevent material damage to the hydrologic balance outside the permit area in light of the probable hydrologic consequences of mining." And this factual finding was substantially supported by the record because, during the five-day hearing, the Board heard extensive expert witness testimony regarding ACD's steps to prevent material damage to the hydrologic balance outside the permit area.

¶ 49 And the Board's conclusions are supported by Utah's regulatory authority. As noted above, Utah's regulatory program does not require the Division to establish "material damage criteria." *See* UTAH ADMIN. CODE R645–301–729.100; UTAH CODE § 40–10–10(2)(c)(i). And the federal statutory scheme allows the Division and the Board to "determine on a case-by-case basis meaningful objective material damage criteria in order to make the finding regarding material damage." 73 Fed.Reg. at 78,977. The Division's CHIA satisfied this requirement. After evaluating water quality surrounding the Coal Hollow Mine prior to the commencement of mining operations, the Division discovered that the water quality levels already contained high levels of certain minerals. Based on this analysis, the Division properly established a threshold limit, which was higher than normal levels, to be compared against future samples and evaluate whether water

quality levels had deteriorated. This satisfied Utah's statute and the federal regulatory guideline. Therefore, we cannot determine that the Board's interpretation was clearly erroneous or arbitrary and capricious, and we affirm the Board's decision on this issue.

## III. THE BOARD PROPERLY CONCLUDED THAT THE HYDROLOGIC MONITORING PLAN WAS ADEQUATE

¶ 50 Finally, Petitioners argue that the Board erred in concluding that ACD's hydrologic monitoring plan was adequate. Petitioners contend that ACD's mine permit was deficient because it did not include a separate narrative explaining how monitoring data may be used to determine the impacts of ACD's mine on the hydrologic balance. Petitioners' argument relies on a proposed amendment to the federal statute, SMCRA.

¶ 51 Whether the applicable statutes require a "narrative" presents an issue regarding the Board's legal interpretation of the Utah Coal Mining Act's permitting requirements. We will only overturn the Board's legal conclusions regarding the Mining Act if they are "clearly erroneous." *See* UTAH CODE § 40–10–30(3)(e). But the issue of whether the Board properly concluded that the hydrologic monitoring plans were adequate under the statute presents a mixed question of fact and law because it required the Board to apply its legal interpretations to the facts of this case. We will only overturn the Board's conclusions based on mixed questions of fact and law if they are arbitrary and capricious. *Associated Gen. Contractors v. Bd. of Oil, Gas & Mining*, 2001 UT 112, ¶¶ 18–19, 38 P.3d 291. We reiterate that because the Board has been granted explicit discretion under the Utah Coal Mining Act and "possesses expertise concerning the operative provisions at issue," we give great deference to the Board's conclusions. *Id.* ¶ 18.

¶ 52 Petitioners argue that the federal law, SMCRA, requires "a narrative statement describing how monitoring data may be used to determine hydrologic impacts and judge the effectiveness of remedial and reclamation techniques." (Surface Coal Mining and Reclamation Operations, Permanent Regulatory Program, 47 Fed. Reg. 27,719 June 25,1982) (to be codified at 30 C.F.R. §§ 701, 779, 780, 783, 784, 816, and 817). Petitioners argue that, because the language of Utah's Coal Mining Act closely follows SMCRA, "both the Division and the Board have a mandatory duty to interpret and apply the Utah regulations 'in accordance with' ... the parallel federal rule because that statement constitutes the federal agency's contemporary interpretation of its own regulations." Petitioners argue that "Utah's regulations must be interpreted to require each permit applicant to provide a 'narrative statement' demonstrating how 'adverse impacts due to mining would be distinguishable from those due to other causes.' "

¶ 53 Petitioners' interpretation is flawed in a fundamental respect: this proposed federal rule, which would have required a "narrative" describing how hydrologic monitoring data would be used, was never actually codified into the federal law. Petitioners cite to commentary from the OSM, which addressed a "propose[d] major revision and reorganization of the existing hydrology ... permitting ... rules" under SMCRA. 47 Fed. Reg. 27,712. Under this proposal, SMCRA would have been rewritten to require a permit applicant to specifically require "a narrative that describes how the data may be used to determine the impact, if any, of the operation upon the hydrologic balance" of ground-water and surface-water surrounding the proposed mine in their hydrological monitoring plan. *Id.* at 27,727 (proposed redefinition of 30 C.F.R. § 780.21(j)(1), (k) (emphasis added)). But this proposed language explicitly requiring a "narrative" was not codified in the federal statute. *Compare* 30 C.F.R. §§ 780.21(i), (j). Petitioners' entire argument with respect to the hydrological monitoring criteria relies on this unadopted amendment to federal law. It therefore fails.[5]

5. We note that Petitioners' argument also overstates the relationship between federal regulatory materials and Utah's own permitting procedures under the Utah Coal Act. As discussed above,

¶ 54 The Board made the legal conclusion that

[t]his Board's rules require that a permit application must include monitoring plans for surface and groundwater. [UTAH ADMIN. CODE] R645–301–731.211, 731.221. The plans must describe how the monitoring data will be used to determine the impacts of the operation on the hydrologic balance. *Id.* The rules do not indicate the level of detail an applicant must supply to comply with this requirement.

The Board's legal conclusion is supported by the plain language of Utah's Coal Mining Act.

¶ 55 Under the Mining Act, the plain language of the statute does not require a separate "narrative" describing how data will be used. Rather, Utah's regulatory code requires only that a permit application "include a ground-water monitoring plan" which will, among other things, "describe how [certain] data may be used to determine the impacts of the operation upon the hydrologic balance." UTAH ADMIN. CODE R645–301–731.211.

¶ 56 ACD's permit application met this statutory requirement. The Board found that "the provisions of the monitoring plans and related documents, both on their own and when read in conjunction with the regulations, address and adequately disclose how the monitoring data may be used." This factual finding is substantially supported by the record. ACD's mining application included a Mining and Reclamation Plan, which included information and examples illustrating how to use and interpret the monitoring data to detect mining-related impacts. Specifically, the Mining and Reclamation Plan included water quality analysis using Stiff diagrams, other graphical techniques specifically used for detection of degradation in water quality, analysis of water quantity impacts using the Palmer Hydrologic Drought Index, detailed reaction chemistry for surface and ground-water, identification of which parameters might be expected to change if water adversely interacted with the

Tropic Shale, and other data analysis tools. This evidence convinces us that the Board's findings were "reasonable and rational." *Associated Gen. Contractors,* 2001 UT 112, ¶ 21, 38 P.3d 291 (internal quotation marks omitted). Because we cannot conclude that the Board's actions were arbitrary or capricious, we affirm the Board's conclusion that ACD's hydrologic monitoring plan was adequate under the statute.

## CONCLUSION

¶ 57 The Board acted within its discretion in affirming the Division's conclusions that ACD's mining permit application satisfied all of the statutory and regulatory requirements. We therefore affirm the Board's approval of ACD's mining permit.

Justice PARRISH authored the opinion of the Court, in which Chief Justice DURRANT, Associate Chief Justice NEHRING, Justice DURHAM, and Judge FAUST joined.

Having recused himself, Justice LEE does not participate herein; District Judge ROBERT P. FAUST sat.

---

Utah is a primacy state with exclusive jurisdiction over surface coal mining operations on non-federal lands and therefore, we are not bound by federal regulatory commentary on this issue. *See supra* ¶¶ 41–42.